## MARSH v. WHITMORE.

1. An attorney cannot be charged with negligence when he accepts as a correct exposition of the law a decision of the Supreme Court of his State upon the question of the liability of stockholders of corporations of the State in advance of any decision thereon by this court.

2. Where an attorney sold bonds of a client at public sale, and bought them in himself, at their full value at the time, and the client was aware of the purchase and acquiesced in it for twelve years, it is then too late for the client to attempt to impeach the validity of the sale.

APPEAL from the Circuit Court for the District of Maine. On the 12th of March, 1869, Marsh, of Maryland, filed a

bill in the court below against Whitmore, an attorney and counsellor of Maine, to compel him to account for certain bonds of the Kennebec and Portland Railroad Company, and to charge him with certain notes of the same corporation, received from him, the complainant; and which bonds and notes the bill alleged that he, the complainant, had, in the year 1855, placed in the hands of the defendant as security for advances to be made by him in effecting a compromise with the complainant's creditors in Maine, and for a reasonable compensation to himself for his own services as counsel.

*As to the bonds.*  The bill alleged that in the year 1856, they had been sold by the defendant at public auction in disregard of his duty, and at the sale were bid in by himself, through the intervention of third parties, at an amount greatly below their value at the time, which conduct the bill charged to have been in fraud of the complainant's rights, and not to have come to his knowledge "*until lately.*"

*As to the notes.*  The bill alleged that at the time they were placed with the defendant, he was instructed to institute suits upon them and to attach certain personal property of the corporation pointed out to him, and if the notes were not thus paid, to collect them from the stockholders, who were personally liable; and that the defendant agreed to attend diligently to their collection; that they could have been collected of the company or stockholders, and that if they were not collected the failure was attributable to his gross neglect.  The prayer of the bill was that the defendant might be charged with the full amount of the notes and interest, and might be decreed to surrender the bonds, or, if that was impossible, to pay their full value in money; or that such other or further relief might be granted as the justice of the case might require.

The bill called upon the defendant to answer its several allegations touching these two matters; and to answer also certain specific interrogatories which were annexed.

Among the interrogatories was this one, relating to the bonds:

"Did you or did you not represent to the complainant, after the sale of the bonds, that you had made such sale at public auction after advertising the same; and that such sale was *bonâ fide?*"

The answer denied that the bonds and notes were intrusted to the defendant for the purpose alleged in the bill, but averred—

*In regard to the bonds.* That they were placed with him as security for any liabilities which one Paine and himself might incur for the complainant and for the payment of his three promissory notes, exceeding in amount $3000, and one note for $90, upon which the defendant was surety for the complainant; that the complainant never paid either of these notes, and that after having informed him, on the 27th of August, 1856 (the promissory notes of the complainant being then due and unpaid), that the bonds would be sold on the 1st of October following, and after repeated postponements, made at his request, the bonds, in June, 1857, after notice to him, were sold at public auction in order to pay his, the complainant's, notes; that at the sale some of the bonds were purchased by third persons, but that the larger portion were bid in by the defendant; that the prices given were the full and fair value of the bonds at the time, and greater than their market value for years afterwards; that the amounts bid were indorsed on the notes of the complainant, and an account of the sales, showing the prices obtained and the names of the purchasers, was transmitted to him; that subsequently, in 1858, in an interview at Augusta, the defendant offered to obtain the bonds and return them to the complainant if he would pay his notes, and that he replied that the bonds were not then worth as much as they were sold for, and that the defendant must keep what was obtained, and if he were ever able he would pay the balance; that subsequently the bonds were greatly depreciated in the market, and in 1858 and 1859 were sold as low as at the rate of ten dollars for the hundred.

To the specific interrogatory, abovementioned, as having been put to him about the bonds, the defendant answered:

" I did after said sale send to the complainant the auctioneer's account of the sale, giving names of purchasers and prices for which the bonds sold, and afterwards, at the interview in Augusta, in 1858, I did state to the complainant, in substance, but not in the precise words, that I made the sale at auction after duly advertising the same, and that the sale was a good sale.  I did not, to my recollection, use the words '*bonâ fide*.'  I then stated to the complainant the gross amount of the sale, and that it had been applied on the notes."

*As to the notes.*  The defendant met the several allegations of the bill by direct denial, and averred that the corporation was hopelessly insolvent, and that all its property was mortgaged for more than it was worth, and that this fact was known to the complainant at the time the notes were placed in the defendant's hands; and that a suit was commenced against the corporation with a view of enforcing their collection from the stockholders, but was abandoned in consequence of a decision of the Supreme Court of the State of Maine, made in 1858,* that the stockholders were not liable; a decision which was subsequently, to wit, in 1864,† reversed in this court, but which previously had been by many acted on as practically ending controversy.

*In respect to both bonds and notes.*  The material allegations of the answer were sustained by the evidence, except that one in regard to the bonds, which alleged that an account of the sales, showing the prices obtained, and the names of the purchasers, was transmitted to the complainant.  That rested on the interrogatory and the answer to it.

The evidence showed also that no demand had been made on Whitmore to account, until January 23d, 1869, in which year, after the great depressions already mentioned in the answer to the price of the bonds, following the sale now in question, they suddenly rose in value.

The court below held:

*As to the notes.*  That the insolvency of the company and the decision of the Supreme Court of Maine were a sufficient defence.  It said:

---

* 46 Maine, 302.        † Hawthorne v. Calef, 2 Wallace, 10.

" This decision was made in 1858, and was almost universally acquiesced in by the profession; hundreds of actions were decided in accordance with it, and it was not until December, 1864, that the decision was reversed by the Supreme Court of the United States.   An attorney certainly cannot be chargeable with negligence when he accepts as a correct exposition of the law a solemn decision of the Supreme Court of the State."

*As to the bonds.*  That the answer to the specific interrogatory about the transmission of the account of sales, &c., was responsive to the averments of the bill and to the specific interrogatory put, and was evidence in the respondent's behalf to prove that soon after the sale the complainant had full information as to the prices obtained, and as to the persons by whom the bonds were purchased; that this being so, the complaint was stale.

The court below therefore dismissed the bill.   The complainant took this appeal.

*Mr. A. G. Stinchfield, for the appellant; Mr. Artemus Libbey, contra.*

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

The answer of the defendant is sustained in all material allegations by the evidence in the case, except in one particular, which we will presently mention.

So far as the notes are concerned the case may be dismissed from further consideration.   The bill does not charge any fraudulent conduct on the part of the defendant in connection with them, but merely a neglect of professional duty in prosecuting them.   The insolvency of the company, and the amount of its mortgages, are a sufficient answer to the charge for neglecting to proceed against its property, and the decision of the Supreme Court justified the withdrawal of the proceeding instituted to charge the stockholders.   As justly observed by the learned district judge who presided in the Circuit Court on the trial of this case, an attorney cannot be charged with negligence when he accepts as a

correct exposition of the law a solemn decision of the Supreme Court of the State. That decision was made in 1858, and was so generally acquiesced in that numerous kindred suits were disposed of in conformity with it.

The particular in which the evidence fails to fully support the allegations of the answer relates to the transmission averred to have been made to the complainant of the account of the sales had, showing the prices obtained and the names of the purchasers. But in this particular we think the answer is so far responsive to the averments of the bill that it must be taken as evidence on behalf of the defendant. And there is much in the testimony, and the circumstances attending the sale, which leads to the conclusion that the complainant was informed of the prices received. He was deeply interested in the sale; he had notice of the time and place at which it was to be made; and it had been postponed on several occasions at his request. It is hardly credible that he did not ascertain the prices which the bonds brought when the sale was made. It is not a reasonable inference that he lost all interest in the result when he was unable to obtain a further postponement of the sale. And if he ascertained the prices, it is highly probable that he ascertained the names of the purchasers also.

The sale of the bonds was made in June, 1857, and it was not until January, 1869, nearly twelve years afterwards, that the complainant asserted any claim to the bonds, or any claim that the defendant was accountable to him for any neglect of duty or misconduct in relation to them. The question, therefore, is, whether the complainant under these circumstances, after this long acquiescence in the acts of the defendant, with knowledge of the transaction, can call upon him to account for the present value of the bonds purchased by him. Most undoubtedly that sale was voidable. The character of vendor and that of purchaser cannot be held by the same person. They impose different obligations. Their union in the same person would at once raise a conflict between interest and duty, and, constituted as humanity is, in the majority of cases duty would be overborne in the

struggle.  The law, therefore, wisely prohibits a party sell-
ing on another's account from becoming a buyer on his own
at the sale, and will always condemn transactions of that
character whenever their enforcement is attempted.  The
complainant could have treated the purchase made by the
defendant as a nullity.  He could have insisted that the re-
lation of the defendant to the property was not changed by
the proceeding, and that he stood charged with the same
trust respecting it with which he was charged previously.
And were there nothing more in the case than the fact of
the sale and purchase, the complainant would be entitled to
call the defendant to account for the full value of the bonds.
But unfortunately for him there is more in the case.  He
has adopted and approved of the transaction.  His declara-
tion to the defendant at Augusta the year following the sale
is evidence tending to that effect, and considered in connec-
tion with his long acquiescence in the transaction, must be
deemed conclusive.  Had he at once denied the validity of
the transaction, or by any declaration or proceeding indi-
cated dissatisfaction with it, or even refrained from expres-
sions of approval, he would have stood in a court of equity
in a very different position.  There is no doubt that the
prices bid at the sale were all that the bonds were then
worth, and there is no reason for imputing intentional fraud
to the defendant.  Under these circumstances he may very
well have been justified in assuming, and in acting upon the
assumption, that the complainant was satisfied with his pro-
ceedings.  The fact that the complainant never felt himself
aggrieved until the bonds of the company had risen to their
par value, which only occurred after this court had adjudged,
on appeal from the Supreme Court of the State, that the
stockholders were personally liable for its debts, leads to the
inference that the present suit was prompted more by a
spirit of speculation than any sentiment that injustice had
been done to him.

At any rate the claim now presented is a stale one.  The
complainant does not set forth specifically any grounds which
could have constituted impediments to an earlier prosecu-

tion of his suit. He does not even inform us when he first became acquainted with his supposed wrongs. His language is that he was not aware of the purchase by the defendant *until lately*—language altogether too vague to invoke the action of a court of equity. The party, says this court in *Badger* v. *Badger*,* citing from previous decisions, who appeals to the conscience of the chancellor in support of a claim, where there has been laches in prosecuting it, or long acquiescence in the assertion of adverse rights, " should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer."

The reasons here stated apply to the present case, and justify the decree of the Circuit Court dismissing the complainant's bill; which is, therefore,

AFFIRMED.