STEPHEN JOHNSON v. D. A. OUTLAW.

1. ATTORNEY AND CLIENT. *Attorney of creditor. When permitted to purchase debtor's property.*

An attorney holding for collection for a client choses in action, not being liens or charges upon the property of the debtor, is not precluded by his obligations to his client from purchasing the debtor's property at a judicial sale with which his client has no connection, if the purchase be free from intentional *mala fides* on his part. And in such case the attorney is not bound to notify his client of the sale before it takes place.

2. SAME. *Attorney of judgment-creditor. Not allowed to purchase debtor's property.*

Where an attorney controls for several clients two or more judgments, he may have the debtor's property sold under the senior judgment, and may purchase it for his clients; but if he purchases for himself, the law regards him as holding the legal title in trust for his clients, and not as owner of the property; and any of such clients may claim the property, and, by refunding the money paid out by the attorney, will become entitled to the benefit of the purchase. In such circumstances the attorney is legally disabled to purchase for himself the debtor's property; and the questions, whether the purchase is made in good or bad faith, whether detrimental to the interest of the client or clients, and whether profitable to the attorney, are not considered in law.

3. SAME. *Attorney purchasing debtor's property. Duty of client claiming benefit.*

When a client becomes aware of the fact that his attorney has purchased for himself property in relation to which he has some claim or interest, which has been intrusted to the care and management of the attorney, it is his duty, if he purposes to claim the benefit of the purchase, to notify the attorney promptly of his election in respect thereto; and this duty is especially incumbent upon the client where there has been no moral turpitude in the conduct of the attorney, or where a delay in the assertion of the client's rights will

affect the position of the parties to the transaction, or the value of the property And if the client in such case, instead of making known to the attorney his election to claim the property, pursues a course of conduct indicating his acquiescence in the purchase by the attorney, he cannot, after several years have elapsed, and the attorney has erected valuable improvements upon the land, for the first time claim the benefit of the purchase.

APPEAL from the Chancery Court of Leflore County.

Hon. R. W. WILLIAMSON, Chancellor.

The case is stated in the opinion of the court.

*Harris & George*, for the appellant.

1. The rule which incapacitates a fiduciary to purchase the estate with which a professional or other agency connects him is founded in the principle that, to insure complete and unswerving fidelity, he must never antagonize the client, or principal, or beneficiary, by creating an interest which shall oppose his duty. In purchasing the property with which he is connected professionally, the attorney is not to be the judge of whether his client's interest will oppose his own, because he then becomes the judge in his own case. The position of the lawyer is likened to that of the judge deciding his own case. The object of the rule referred to is, not to defeat fraud, so much as to take away by disqualification the temptation to commit fraud, in order to secure an impersonal and unbiased fidelity in an all-powerful profession, which has become essential to the business of modern society. When Outlaw bought the property in controversy, he became thenceforth hostile to Johnson's judgment, which he was in duty bound to enforce by every legal means. *Stockton* v. *Ford*, 11 How. (U. S.) 232; *Galbraith* v. *Elder*, 8 Watts, 81; *Hackenburg* v. *Carlisle*, 5 Watts & S. 348; 25 Pa. St. 354.

2. Where an agent does an unauthorized act, there is no legal obligation on the principal to ratify or adopt it; and where there is no legal obligation or duty to do an act, there can be no negligence in the omission to perform it. *Combs* v. *Scott*, 12 Allen, 493; *Hardeman* v. *Ford*, 12 Ga. 205; *Dodge* v. *McDonnell*, 14 Wis. 553. To make a ratification binding, the principal must have known that the act of the agent was

invalid, and would not be binding on him without his ratification. *Pittsburg & Steubenville R. Co.* v. *Gazzam*, 32 Pa. St. 348; *Garvin* v. *Lowry*, 7 Pa. St. 24.

*Helm & Kimbrough*, on the same side, filed a lengthy brief on the facts of the case, and, as to the legal incapacity of the appellee to purchase the property in controversy, cited the following additional authorities : *Merritt* v. *Lambert*, 10 Paige, 359; 10 Am. Rep. 50; Lewin on Tr. 226; *Howell* v. *Baker*, 4 Johns. Ch. 118; *Foreman* v. *Kent*, 3 Dana, 617; *Scisening* v. *Black*, 5 Watts, 303; *Lefevre* v. *Laraway*, 22 Barb. 176; *White* v. *Trotter*, 14 Smed. & M. 30; Story's Eq. Jur. 332; 1 Saunders on Tr. 430; Adams's Eq. 184, 412.

*J. Z. George*, of counsel for the appellant, argued the case orally.

*J. E. Gwin* and *T. C. Catchings*, for the appellee.

1. Outlaw's purchase of the land was made in good faith. It was impossible for him to make the money on Johnson's judgment out of the land purchased. But, supposing that Outlaw did not purchase in good faith as to Johnson, still the latter cannot maintain his bill, because he fully recognized Outlaw's purchase of the land and his title thereto. If a fraud is committed upon a party, and he submits to it after a knowledge of it, he cannot afterwards complain. The letters written by Johnson show clearly that he recognized Outlaw's right to the land. "Fraud must be resisted at the proper time, and before the proper tribunal ; for it is the policy of the law that litigation should not be protracted," etc. *Porter & Co.* v. *Kilpatrick*, 24 Miss. 414.

2. Has Johnson come into equity with the showing that he is willing to do equity? He has not offered to pay Outlaw for taxes paid on the land, nor for improvements on the land, nor for the amount paid by him for the land at the sheriff's sale. Johnson knew of these expenditures by Outlaw. Only a constructive fraud is charged in the bill, and under such a charge Johnson should have at least offered to repay Outlaw all the money he had expended. *Eliza White, Admrx.*, v.

*Silas F. Trotter et al.*, 14 Smed. & M. 30 ; *Howell, Assignee,*
v. *Baker & Clark*, 4 Johns. Ch. 117.

3. It is evident that Johnson and Wilbourn entered into an
agreement for the purpose of defrauding Outlaw out of his
property, with the improvements thereon, as well as the
money paid out by him in respect thereto. He who comes
into equity must come with clean hands. *Walker* v. *Brun-
gard*, 13 Smed. & M. 723. The proof shows that Johnson and
Wilbourn agreed that the latter should sue Outlaw for the
land, and, if successful, that Johnson should have the land.
It follows, therefore, that Johnson is bound by the result in
that case, and cannot recover in this suit, no matter how good
a case he may have. *Lipscomb* v. *Postell*, 9 Geo. 496.

*T. C. Catchings*, on the same side, also filed an elaborate
brief on the facts of the case, and, as to the appellant's negli-
gence in making his claim, cited the following additional
authorities : *Follansbe* v. *Kilbreth*, 17 Ill. 528 ; *Scott* v. *Free-
land*, 7 Smed. & M. 409 ; *Jones* v. *Smith*, 4 Geo. 215.

*J. E. Gwin* and *T. C. Catchings* also made oral arguments.

CHALMERS, J., delivered the opinion of the court.

This is a bill brought by Johnson, seeking to hold Outlaw
as trustee for him in the purchase of a tract of land, upon the
ground that Outlaw, as his retained attorney at law, was pre-
cluded from buying for himself, and that his purchase inured
to the benefit of the client. The facts are these : Outlaw held,
for suit and collection, three notes belonging to and received
from Johnson, against one Wilbourn. Upon all of them suit
had been brought, and upon one of them a judgment had
been recovered. There were various other judgments, in favor
of different persons, enrolled against Wilbourn, several of
which were older in time and prior in lien to that of Johnson.
One of these older judgments was in favor of Outlaw as admin-
istrator of H. O. Bridges, deceased. In the autumn of 1870,
Outlaw caused an execution on this judgment in his favor as
administrator to be issued and levied on Wilbourn's undi-

vided half-interest in three hundred and eighty acres of wild
land jointly owned by Wilbourn and Johnson.    At the sale
under this levy, Outlaw purchased the land for himself; and
it is this title, thus acquired, that Johnson seeks to have the
benefit of.

The land, or rather Wilbourn's half-interest in it, sold for
the trifling sum of $200.    Its intrinsic value was about $1,200
or $1,500; but Wilbourn had only a tax-title, which, though
probably good, was distrusted; and it is shown, moreover,
that there was at the time no market value for such lands,
and there was such scarcity of money in the country that
many places more valuable had been sold under the hammer
at prices equally inadequate.    The sale was fairly conducted,
upon a public day, when some other lands were sold at prices
equally ruinous.    There was quite a crowd present, among
whom was the second husband of the widow of H. O. Bridges,
in whose interest the sale was made.    The representatives
of the Bridges estate were then, and are now, entirely
satisfied with the sale, and are content that Outlaw should
retain the land.    But Outlaw was also the attorney of John-
son, who lived in another county, who was not present,
and who had no notice of the sale.    What were his duties as
to him?    So far as the notes, upon which suits were then
progressing, are concerned, it is evident that they must be left
out of view.    They were not liens on the land, and had no
connection with it; nor had it then been judicially ascertained
that they were ever valid debts against Wilbourn.    The mere
fact that an attorney holds for collection choses in action,
not liens, nor in any way charges upon the property of the
debtor, will not operate to preclude him from purchasing
the property of the debtor at a judicial sale with which his
client has no connection; nor is he bound to notify his client
of the sale, in advance.    We speak, of course, of a case free
from actual fraud, intentional *mala fides*, upon the part of the
attorney.

But upon one of the notes due Johnson a judgment had

been by Outlaw already recovered; and while he might, in the interest of the estate which he represented, and which had the older lien, antagonize Johnson's interests under this judgment, he could not do so for his own benefit.

He occupied exactly the attitude of a person who is trustee in a senior and a junior mortgage. At a sale under the senior, he may purchase for the benefit of the *cestuis que trust* secured thereby; but if he buys for himself, he holds at the option of the beneficiaries in either instrument to claim the property. Whether claimed by either, they are only required to refund the money expended in the acquisition by him.

Outlaw excuses his act in buying for himself, and his failure to notify Johnson of the sale in advance, upon the ground that there were so many and such large judgments prior in lien to that of Johnson, that he did not conceive it possible that the latter could have any interest in the matter, or would think for a moment of buying the property thus encumbered. The record bears him out in these assertions, and acquits him, we think, of any intentional bad faith. But it is not a question of good and bad faith; it is a legal disability imposed by law, a positive prohibition, springing out of the relation of client and attorney.

The lawyer shall not antagonize his client. It is not for him to judge whether his act will be practically detrimental to the client or not. If he buys property upon which his client has a claim, and in relation to which he has, in any manner, assumed a professional connection, it is for the client alone to say whether he will claim the benefit of the purchase.

This rigid rule is essential to the confidence which must subsist between the parties; and, by precluding the possibility of a profit made at the expense of the client, removes all temptation to attempt it.

The law will not stop to inquire into motives and intentions, nor to calculate whether, in fact, a profit has been made; but whenever advised that the attorney holds, as his own, property in relation to which he had been intrusted with guarding the

interests of his client, it will compel him to hold as trustee, and not as owner. *Lewis* v. *Cameron, ante,* p. 76 ; *Stockton* v. *Ford,* 11 How. (U. S.) 232 ; *Galbraith* v. *Elder,* 8 Watts, 81 ; *Hackenburg* v. *Carlisle,* 5 Watts & S. 348.

It is evident that while the law gives to the client this ample protection, it must devolve upon him the reciprocal obligation of promptly notifying the attorney that he proposes to claim it. As soon, therefore, as he learns that the attorney has purchased for himself, he must at once exercise his election of claiming the benefit of the transaction. This duty will be especially incumbent where there has been no moral turpitude in the act of the attorney, and where a delay in the assertion of his rights will affect the position of the parties or the value of the property.

In the case at bar, Johnson was informed of Outlaw's purchase within a few weeks after it occurred. He manifested no sort of dissatisfaction with it ; but, on the contrary, seemed gladly to welcome him as a co-tenant. In conjunction with himself, he permitted Outlaw to make valuable improvements on the property, and united with him in executing leases ; or, rather, he authorized Outlaw to act for him in making leases, which was done. He wrote him frequent letters, in which he referred to the land as " our land," and gave his consent to the improvements proposed. He shared with Outlaw in the expense and the benefits of those improvements ; and upon one occasion, when called upon by Outlaw for his share of the expense of building a house which had been wholly erected by the latter, he excused himself on the ground that Outlaw had gotten the benefit of a house which he had himself built on the land before the acquisition by Outlaw of his title.

Again : when Outlaw proposed to make partition of the common property, he declined, upon the ground that his own title was perfect, while Outlaw had acquired only a tax-title.

Five years and a half intervened between the purchase by Outlaw and the bringing of this suit, during all of which time

Johnson failed directly to assert the present claim. In the meantime the land has advanced greatly in value.

It is true that, about eighteen months after Outlaw had bought, Wilbourn, the judgment-debtor, filed a bill to vacate and annul the sheriff's deed held by him, on account of various irregularities supposed to have occurred in the execution-sale; and it was developed during the progress of that litigation that it was carried on for the benefit of Johnson, to whom Wilbourn was to convey the land if recovered from Outlaw. That suit, however, was decided in favor of Outlaw; and if it is to be regarded as the assertion of a claim to the land by Johnson, it is *res adjudicata* as to him. But it was in no sense an assertion of the present claim, based on the fiduciary relation between client and attorney, and it could in no manner have admonished Outlaw that his client was dissatisfied with his conduct. Johnson undertakes to account for the long delay by saying that during all, or at least a considerable portion, of the time, he was ignorant that Outlaw was holding adversely to himself, and that he supposed that he would, or did, recognize his rights. Unfortunately his letters written within a few months of Outlaw's purchase utterly negative this assertion, and conclusively show that he then regarded Outlaw as a co-tenant with himself, and as holding in his own right.

We have carefully scrutinized these letters, aided by the arguments of counsel on Johnson's behalf, and have compared them with his pleadings and deposition, and we find them utterly irreconcilable. No possible meaning, consistent with the language used, can be given to them, except a plain recognition of Outlaw's personal claim to, and right in, the land.

Taken in connection with many other facts in the case, they lead to the conviction that the idea of claiming the land on the theory presented by this bill was never conceived until, by the lapse of time, some of the encumbrances on it had become barred by the Statute of Limitations, and others had been discovered to be fictitious and fraudulent; and until, by the

expenditure of labor and money, the land itself had greatly enhanced in value.

Under these circumstances, the bill cannot be maintained, and was properly dismissed by the chancellor. *Marsh* v. *Whitmore*, 21 Wall. 182.

Affirmed.