### FRAKER v. HOUCK et al.

*(Circuit Court, D. Kansas.   October 16, 1888.)*

MORTGAGES—DEEDS OF TRUST—BILLS TO REDEEM—LACHES.

> While complainant was confined in the penitentiary, for violation of the national bank act, the trustee, under a deed of trust to secure complainant's indebtedness to the bank, of which he had been president, sold the property to purchasers, who in good faith paid full value, the proceeds being applied to the debt, of which they paid only a small part. Complainant was pardoned within a few months after these sales, and, although he knew of them, and that the purchasers, supposing they had good title, were making improvements on the premises, he did not until more than seven years afterwards give any notice that he had any claim to them; paying no taxes, nor offering to pay any, nor taking any other step to assert his rights. Complainant contends that, because of his imprisonment at the time of the conveyances, they were, under the Kansas statutes, absolutely void, and that, as the trust deed gave no power of sale without a decree establishing the debt, he is in the position of a mortgagor out of possession, and entitled to redeem. *Held*, that the claim must be adjudged stale.

In Equity.   Bill to redeem realty from a deed of trust.   On demurrer.
*L. H. Waters, Geo. H. English,* and *Geo. W. McCrary,* for complainant.
*W. W. Scott, Sluss & Stanley,* and *A. L. Redden,* for defendants.

BREWER, J.   This is a bill brought by complainant to redeem certain real estate from a deed of trust executed on the 18th of September, 1876. The circumstances under which this deed of trust was given are these: The First National Bank of Wichita had suspended.   It was expected that a receiver would soon be appointed by the United States comptroller. Complainant had been president of the bank, and was largely indebted to it at the time of its suspension.   James R. Mead was named as trustee, and, in addition to the ordinary language of a trust deed, making the conveyance as security for the payment of his indebtedness to the bank, the instrument contained the following provision:

"Provided, further, that the said James R. Mead, party of the second part, shall at once take possession of the premises hereby conveyed, and proceed to receive and collect the rents, issues, and profits of the same. Provided, further, that, if default be made in the payment of any of the indebtedness or liabilities herein secured, when the same becomes determined, and due and payable by the terms or nature of such several items of indebtedness or liability, the said party of the second part, or his successors, shall, as soon as practicable, after he shall be directed so to do by the comptroller of the United States,

proceed to sell the lands and tenements hereinbefore described, or so much thereof as may be necessary, at public or private sale, as he shall be directed by the comptroller of the currency or other competent authority, and convert the same into money, and execute to the purchaser or purchasers thereof a deed or deeds for the conveyance of the same. And the said party of the second part, or his successors, shall, immediately upon the receipt thereof, pay and apply the moneys arising from the sale of said lands and tenements, and the rents and incomes that he may receive upon the same, as follows: *First.* Pay the reasonable and necessary costs and expenses of executing this trust. *Second.* That all the rest and residue of the moneys arising from the sale of said lands and tenements, and the rents and incomes thereof, he shall pay to the said the First National Bank of Wichita, Kansas, its successors or assigns, or to its duly appointed and qualified receiver, as aforesaid, in payment, as far as it will go, of the indebtedness and liability of the said J. C. Fraker to the said the First National Bank of Wichita, Kansas, of every form, as hereinbefore described. But in the event that the said lands and tenements should sell for more than enough to pay all the said J. C. Fraker's indebtedness and liability, as aforesaid, to the said the First National Bank of Wichita, Kansas, after the application of the rents and incomes of the same, and the payment of the reasonable costs and expenses of executing this trust, the surplus, if any, shall be returned to the said parties of the first part. Provided, further, that, for the purpose of securing a more speedy execution of the trusts hereinbefore set out and described, and in the further consideration of one dollar in hand paid, the receipt whereof is hereby acknowledged, we, the said parties of the first part, do hereby make, constitute, and appoint the said James R. Mead, and his successor, hereinafter to be designated, our true and lawful attorney, irrevocable, with full power to sell and convey any and all of the real estate hereinbefore mentioned and described, in performance of said trust, and to execute and deliver a deed or deeds to the purchaser or purchasers of the same for the conveyance of the said several tracts of real estate, hereby ratifying and confirming whatever the said James R. Mead, or his successor to this trust, may lawfully do in the premises, the same as if we were personally present, and did the same. The said parties of the first part do hereby nominate and appoint as successor of the said James R. Mead in the execution of this trust the person who shall be appointed receiver of the said the First National Bank of Wichita, Kansas, by the comptroller of the currency of the United States, under the provisions of an act of congress, known as the 'National Bank Act;' that, as soon as such receiver is appointed and qualified, the said James R. Mead is hereby directed to convey to such receiver, as his successor, all and singular the property hereby conveyed to the said party of the second part that may remain then unsold, or any money that may be in his hands arising from the sale of any of said property, or the rents and incomes thereof. And the said receiver shall receive said lands and tenements and all moneys and other property conveyed to him or transferred to him by the said party of the second part, and shall proceed under the directions of the comptroller of the currency of the United States, or other competent authority, to fully perform and execute said trust as hereinbefore directed. And the said party of the second part doth hereby accept the trust created and in him reposed by these presents, and doth, for himself, his heirs, executors, and administrators, hereby covenant and agree to and with the said parties of the first part, their executors, administrators, and assigns, that he, the said party of the second part, will honestly, faithfully, and without unnecessary delay, execute the said trust to the best of his skill, knowledge, and ability, and subject to the advice and consent of the comptroller of the currency of the United States; and that, as soon as the comptroller of the currency of the United States shall appoint a receiver of the said the First Na-

tional Bank of Wichita, Kansas, and said receiver becomes qualified, he will convey and transfer to the said receiver all the lands and tenements and other property or effects that may have come into his hands by virtue of this conveyance as hereinbefore directed. In witness whereof the parties to these presents have hereunto set their hands and seals the day and year first above mentioned.                                             J. C. FRAKER.

"ELIZABETH M. FRAKER.
"JAMES R. MEAD."

On October 21, 1876, H. B. Cullom was appointed receiver, and thereupon Mr. Mead conveyed the property to him. On January 9, 1877, Cullom, as such receiver, obtained authority, from the United States district court for the district of Kansas, for the sale of this property as well as other assets of the bank. During the year 1878 Cullom and his successor, as receiver, conveyed two of the tracts in controversy to parties who were *bona fide* purchasers, and paid full value, the proceeds being applied to complainant's indebtedness to the bank. Part of the property conveyed by this trust deed was a one-third interest in a certain mill. After the failure of the bank, the other owners of the mill property commenced suit in the state court to wind up their partnership affairs, and have the mill sold to pay the partnership debts. This proceeding resulted in a decree and sale, the conveyance being made on the 17th of June, 1878. This interest in the mill is the other property which the complainant seeks to redeem. By the 1st of August, 1878, all the property embraced within this suit had been sold to parties who bought in good faith, and paid full value. On the 13th of October, 1877, complainant was convicted in the United States district court upon the charge of violating the national bank act, and sentenced to imprisonment in the penitentiary for five years. He remained in the penitentiary until October, 1878, when he was pardoned. All the conveyances challenged were made during his confinement in the penitentiary. After his pardon complainant returned to Wichita, and engaged in the milling business, remaining there until February, 1881, when he removed to Arkansas, where he resided until the commencement of this suit, in 1887. The sales of the property conveyed by complainant realized only a small portion of his indebtedness to the bank, and the balance remained a part of the assets in the hands of the receiver until 1880, when, pursuant to an order of the United States district court, this property, with other assets, was sold at public auction, bought in by one Charles Hatton for $6.15, and thereupon assigned by him to complainant for $25. On his return to Wichita, in the fall of 1878, after his pardon, complainant knew of these sales; knew that the purchasers were in possession, supposing they had good title; lived within two blocks of one of them, who occupied his former homestead; knew of improvements being made upon the premises, or a part of them; gave no notice to any of the parties that he supposed he had any claim to any part of the property; left them in perfect ignorance thereof, and in the belief that they had a perfect title, until the year 1885, when he consulted with counsel as to his rights; then gave or caused information to be given to defendants that he claimed the right to redeem. During these years he paid no taxes; made no of-

fer to pay any; took no steps to assert his rights, and so acted as to leave the parties in possession, and claiming title in full belief that they had a perfect title.    It is true that in the year 1879 he wrote one or two letters to the comptroller and Mr. Cullom, the first receiver, to ascertain the state of his account, and failed to get much information; but that seems to be about the only notice he took of past transactions.    Now he claims that, because he was confined in the penitentiary at the time these conveyances were made, they were, under the statutes of Kansas, absolutely void, and that under that trust deed no power of sale was vested in the trustee or receiver without a decree of the court establishing the debt, so that he stands in the position of a mortgagor out of possession, with a right to redeem from those in possession.

I shall not stop the consider the question discussed by counsel as to the effect of the provision quoted from the trust deed.    Neither shall I stop to consider the sufficiency of the plea of the statute of limitations. Though upon that these cases may well be noticed.    *Miner* v. *Beekman*, 50 N. Y. 337; *Hubbell* v. *Sibley*, Id. 468; *Cross* v. *Knox*, 32 Kan. 736, 5 Pac. Rep. 32; *King* v. *Meighen*, 20 Minn. 264, (Gil. 237;) *Green* v. *Turner*, 38 Iowa, 112; *Locke* v. *Caldwell*, 91 Ill. 417.    However, waiving these questions, it seems to me that complainant's claim must be adjudged stale.    It should be noticed that, during the years of his silence, Wichita grew from a small town to a large city, so that one of these properties, worth at the time of its purchase three or four thousand dollars, is now affirmed to be worth fifty thousand.    The doctrine of staleness of claim is one peculiar to a court of equity.    It does not depend for its vitality upon any statute of limitations, but is applied by those courts where, by reason of the lapse of time, the acquiescence or inattention of the claimant, and the changed condition of affairs, it would be grossly inequitable to permit him to assert a right which, if asserted earlier, would have been sustained.    In 2 Pom. Eq. Jur. § 965, the author thus states the rule:

"When a party, with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time, and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains, for a considerable length of time, from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity.    Even where there has been no act nor language properly amounting to an acquiescence, a mere delay, a mere suffering of time to elapse unreasonably, may of itself be a reason why courts of equity refuse to exercise their jurisdiction in cases of active and constructive fraud, as well as in other instances.    It has always been a principle of equity to discourage stale demands.    Laches are often a defense wholly independent of the statute of limitations."

So, in the case of *Hayward* v. *Bank*, 96 U. S. 611, is the matter discussed as follows:

" ' Courts of equity often treat a lapse of time, less than that prescribed by the statute of limitations, as a presumptive bar, on the ground of discouraging stale claims, or gross laches, or unexplained acquiescence in the assertion of an adverse right.' 2 Story, Eq. Jur. § 1520. In *Smith* v. *Clay*, Amb. 645, Lord CAMDEN said: 'A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands when the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. When these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced.' These doctrines have received the approval of this court in numerous cases. *Oil Co.* v. *Marbury*, 91 U. S. 587; *Badger* v. *Badger*, 2 Wall. 87; *Marsh* v. *Whitmore*, 21 Wall. 178; *Harwood* v. *Railroad Co.*, 17 Wall. 79. In the last-named case this court said that, without reference to any statute of limitation, equity has adopted the principle that the delay which will defeat a recovery must depend upon the particular circumstances of each case. The question of acquiescence or delay may often be controlled by the nature of the property which is the subject of litigation. 'A delay, which might have been of no consequence in an ordinary case, may be amply sufficient to bar relief when the property is of a speculative character, or is subject to contingencies, or where the rights and liabilities of others have been, in the mean time, varied. If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his claim at the earliest possible time. He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage.' Kerr, Fraud & M. (Bump's Ed.) 302, 306; *Oil Co.* v. *Marbury, supra*. If Hayward was defrauded of his stock,—if the title did not pass from him or the bank because of the peculiar relations which the purchasers held to him and the property; if he had the right originally, upon any ground, to repudiate the sale, and reclaim the stock,—it was incumbent upon him, by every consideration of fairness, to act with diligence, and before any material change in the circumstances and the value of the stock had intervened. No sufficient reason is given for the delay in suing. His poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights. He must be deemed to have made a final election not to disturb the sale of 1868; and a court of equity should not permit him, under the circumstances, to recall that election. Upon the grounds, then, both of acquiescence and lapse of time, he should be held to have forfeited all right to relief in a court of equity."

See, also, *The Walter M. Fleming*, 9 Fed. Rep. 474; *Graham* v. *Railroad Co.*, 14 Fed. Rep. 753; *York* v. *Mill Co.*, 30 Fed. Rep. 471, *Munn* v. *Burges*, 70 Ill. 604.

Applying these considerations to the case at bar, we have a party, for seven years, with a claim upon property, living in its vicinity, conscious of the fact that parties in possession believe that they have a perfect title, leaving them to go in a belief in the sufficiency of their title, pay taxes, and make improvements, and giving no information as to his claim. Under those circumstances the mere lapse of time makes strongly against the equity of his present assertion. But that is not all. The property which has been sold to the defendants was sold to pay his indebtedness to the bank, and the money paid by the purchasers, which was the fair value of the property, was applied in partial payment of that debt. Yet, notwithstanding these sales, that debt was unsatisfied. The balance of the debt was believed to be absolutely worthless. He says nothing about

his claim until, in a roundabout way, and for a mere song, he acquires and thus extinguishes the claim of the bank against himself, and leaves its creditors largely unpaid. If he had asserted his rights before the bank had parted with this claim against him, it would have been an easy matter, by judicial proceedings, in respect to which no challenge could have been made, to have subjected the property at its then value to the satisfaction of his just debt to the bank; but he waits until, in this roundabout way, he has extinguished the claim of the bank against him, and then seeks to recover possession of the very property which has been in good faith appropriated to the partial payment of his debt. And upon what equity does he rest this claim? Not upon the ground that the property was sacrificed; that a fair value was not obtained; that a just debt was not partially liquidated; but upon the barren and cold averment that, by the letter of the law, a sale and conveyance made while he was in the penitentiary, suffering the just punishment for his crime, was technically void. If there is anything which can make less of an appeal to the conscience of a chancellor than that of an ex-convict, who pleads his own punishment in the penitentiary as a reason why his property which has been in good faith long years ago applied to the satisfaction of his just debts be restored to him, I have yet to hear it. Not the first imputation of bad faith or misconduct is cast upon the defendants. The complainant rests upon the mere technical protection which the law in its humanity casts about him who suffers the punishment of crime. This property, at fair value, was, in the course of supposed due legal proceedings, appropriated years and years ago to the payment of his just debts. Equity forbids that a title apparently conveyed by these proceedings should, after this lapse of time, be disturbed. I think the demurrer of the defendants should be sustained, and sustained, if upon no other, then upon the single ground of the staleness of the claim; and it is so ordered.