NEW YORK SECURITY & TRUST CO. v. LOUISVILLE, E. & ST. L.
CONSOL. R. CO. et al.

(Circuit Court, D. Indiana. November 2, 1899.)

No. 9,125.

1. RAILROADS—CONSOLIDATION AGREEMENT—RIGHTS OF BONDHOLDERS TO EN-
FORCE EXCHANGE OF BONDS.

Certain railroad companies united, forming a consolidated company, the
agreement providing that such company should issue its bonds, secured
by mortgage on its entire property, for the purpose of taking up bonds
of the constituent companies, which bore a higher rate of interest, but the
consolidated company did not assume the payment of their indebtedness.
Such bonds were made and deposited with a trustee; the officers being
authorized to effect an exchange, and, if not effected, to make such ar-
rangements as they deemed for the best interests of the company. *Held,*
that such action was not for the benefit of the holders of the outstanding
bonds, and gave individual holders of bonds of one of the constituent
companies no right to compel the delivery to them severally of bonds of
the consolidated company in exchange for their holdings, especially where
they did not assert any such claim until nine years after the consolida-
tion, and until all the companies had become insolvent, and the property
had been placed in the hands of receivers, during most of which time they
received interest at the higher rate, which they made no offer to return.

2. SAME.

The offer of an exchange of bonds contemplated by the action of the
railroad companies could not be accepted by the holders of outstanding
bonds until it was communicated to them for acceptance by some act of
the companies.

3. SAME—EQUITY—LACHES.

Even had the right of the holders of outstanding bonds to exchange
them for the new bonds existed, it must have been asserted by them
within a reasonable time; and a delay of nine years, without averment
and proof that they could not have known of the offer sooner by the exer-
cise of reasonable diligence, constituted such laches as would bar them
of the right to enforce the exchange after the circumstances of the par-
ties had so changed as to render it inequitable.

This was a hearing on exceptions to the master's report on the
amended intervening petition of Otis Kimball and 29 others, hold-
ers of the bonds of the Huntingburg, Tell City & Cannelton Rail-
road Company, to compel the delivery to them, in exchange for their
bonds, of bonds of the defendant the Louisville, Evansville & St.
Louis Consolidated Railroad Company. The principal suit is one for
the foreclosure of mortgages against the defendant company.

Floyd A. Woods, for interveners.

Hornblower, Byrne, Taylor & Miller, Thomas G. Shearman, and
C. W. Fairbanks, for respondents.

BAKER, District Judge. The petitioners have filed their petition,
on behalf of themselves and of all others similarly situated, to com-
pel the New York Security & Trust Company and George T. Jarvis,
receiver of the Louisville, Evansville & St. Louis Consolidated Rail-
road Company, and also receiver of its constituent companies, to
deliver to them certain bonds executed by the consolidated com-

pany, bearing date July 1, 1889, in exchange for bonds, held by them, issued by the Huntingburg, Tell City & Cannelton Railroad Company. The material facts are these:

October 1, 1887, the Huntingburg, Tell City & Cannelton Railroad Company (hereinafter called the Huntingburg Road or Company) issued its 300 first mortgage bonds, of $1,000 each, to the American Loan & Trust Company of Massachusetts and Noble C. Butler of Indiana, payable on October 1, 1927, in gold coin of the United States, with interest at the rate of 6 per cent. per annum, payable semiannually on the presentation and surrender of the interest coupons thereto attached. To secure the payment of these bonds a first mortgage of the railroad property, equipment, and franchises of the Huntingburg Company was executed to the American Loan & Trust Company and Noble C. Butler, as trustees. The petitioners are the owners and holders of 270 of these bonds. On May 21, 1889, the Huntingburg Company entered into an agreement with the Louisville, Evansville & St. Louis Railroad Company, the Illinois & St. Louis Railroad & Coal Company, the Belleville, Centralia & Eastern Railroad Company, and the Venice & Carondelet Railway Company, corporations organized under the laws of the states of Illinois and Indiana, whereby the above-named railroad companies lawfully consolidated and merged themselves into one corporation, under the corporate name of the Louisville, Evansville & St. Louis Consolidated Railroad Company. By the agreement of consolidation it was stipulated that all the stock and property, real, personal, and mixed, of the constituent companies, should become consolidated under the name of the Louisville, Evansville & St. Louis Consolidated Railroad Company, upon the terms and provisions of the consolidation set forth in the agreement. By the plan of consolidation the several corporations, among other things, agreed that the mortgages then existing upon the property of the parties of the first, second, fourth, and fifth parts (the Huntingburg Company being the party of the fifth part) should be taken up and canceled. It was further agreed that the consolidated company should issue 8,000 consolidated, first mortgage, 5 per cent., 50-year, gold, coupon bonds, of $1,000 each, bearing date July 1, 1889, interest payable semiannually, and secured by a mortgage or deed of trust on the entire property owned or controlled, or thereafter to be owned or controlled, by it. All of the stock and bonds of the consolidated company provided for in the agreement of consolidation were to be placed in some safe place of deposit by its board of directors, and thereafter held in trust for the purpose of exchange according to the terms of the consolidation agreement, except as to 925 bonds therein otherwise provided for; and, in case any owner or holder of any of the bonds or stock of the constituent companies should neglect or refuse to exchange any of such bonds or stock for the consolidated bonds as therein provided, the board of directors of the consolidated company was empowered to make such arrangements in regard thereto as in their opinion the interest of the consolidated company might require, consistent with the provisions of the agreement of consolidation. It was further provided that the board of directors of the consoli-

dated company should have the power, and it was directed, without any formal vote of the stockholders, to make, execute, and deliver all such instruments, contracts, deeds of trust, mortgages, bonds, scrip, and certificates of stock, and other instruments of whatever kind or nature, which were contemplated or might be required to effectuate the true intent and meaning of any provision of the agreement of consolidation. It was further provided, among other things, that, when the bonds were prepared and ready for issue, they should be distributed as follows:

"* * * (d) To be used in taking up and in satisfaction of the first mortgage bonds of the Huntingburg, Tell City and Cannelton Railroad, and in redemption thereof, three hundred of said bonds."

It was thereafter resolved, on May 21, 1889, by the stockholders of the consolidated company, that said company, by its president and secretary, should have the power, and they were authorized and directed, to prepare, print, execute, and deliver $8,000,000 of first consolidated, 5 per cent., gold, coupon, mortgage bonds, running 50 years, interest payable semiannually, and a mortgage or deed of trust on all the property and franchises of the consolidated company, to the New York Security & Trust Company and Josephus Collett, as trustees, to secure the payment of said consolidated bonds as provided in the agreement of consolidation. Pursuant to such authority the president and secretary of the consolidated company executed and delivered the bonds and mortgage to the trustees in trust for the uses and purposes set forth in the consolidation agreement.

Some of the petitioners remained in ignorance of said agreement of consolidation, and of their right to exchange the Huntingburg Company's bonds owned by them for consolidated bonds, until April 28, 1897, others until December 8, 1897, and others until March 19, 1898, at which times they offered to surrender their bonds, and demanded a like amount of consolidated bonds in exchange, which demands were refused by the defendants. It is shown, however, that some of the petitioners participated in the consolidation agreement, and must have known of their rights under it at that time. Of the first consolidated mortgage bonds, there have been issued, and are now outstanding in the hands of bona fide holders, $3,797,-500, and the balance of said bonds is still in the custody and possession of the defendants. The petitioners were paid after May 21, 1889, and before January 1, 1894, 10 semiannual installments of interest on the Huntingburg bonds at the rate of 6 per cent. per annum. They do not offer to repay or account for the difference between the interest received by them on the Huntingburg bonds and the interest which they would have received on the consolidated bonds. On March 1, 1893, the consolidated company prepared and issued $15,000,000 of 4 per cent., gold-bearing, coupon, mortgage bonds, running 50 years, and executed to the New York Security & Trust Company a general mortgage on all its property and franchises to secure the payment of the same. Upwards of $2,000,000 of the general mortgage bonds secured by the mortgage of March 1, 1893, were issued, and outstanding in the hands of bona fide holders for value on January 1, 1894. It is not shown that the

purchasers of the $2,000,000 of general mortgage bonds had any notice or knowledge that the petitioners had any such right as they now assert.

The consolidated company has been insolvent since January 1, 1894, when its railroad and other property were placed in the hands of receivers by this court, and by the United States circuit court for the Southern district of Illinois; and said receivers and their successor have at all times since that date been in possession of its railroad, and all other property belonging to it. On September 6, 1894, the New York Security & Trust Company filed its bill in this court against the consolidated company and others to foreclose the mortgage known as the "First Consolidated Mortgage," and on September 13, 1894, said trust company filed a similar bill for the same purpose in the circuit court of the United States for the Southern district of Illinois. The receivers previously appointed were continued as receivers under these bills. Cross bills were filed in each of the above suits to foreclose the general mortgage of March 1, 1893, for the benefit of the holders and owners of the $2,000,000 of outstanding bonds secured by it. These suits are still pending and undetermined. In March, 1896, suits were begun by the American Loan & Trust Company of Massachusetts and Noble C. Butler of Indiana, as complainants, in this court, and also in the circuit court of the United States for the Southern district of Illinois, to foreclose two mortgages executed on or about October 20, 1886, by the Louisville, Evansville & St. Louis Railroad Company, one of the parties to the consolidation agreement, and receivers were appointed for said property in said suits. Said foreclosure suits are still pending and undetermined. On March 9, 1896, the American Loan & Trust Company and Noble C. Butler, as trustees, began suit in this court to foreclose the mortgage executed by the Huntingburg Company on October 1, 1887, to secure 300 bonds, of $1,000 each. In this suit on April 24, 1896, George T. Jarvis was duly appointed receiver of the railroad and property of the Huntingburg Company. At this time Jarvis became sole receiver in all the cases then pending in this court and in the circuit court of the United States for the Southern district of Illinois. On February 18, 1896, the following request to begin the last above named suit was presented to the American Loan & Trust Company:

"We, the undersigned, a committee of a majority of the bondholders in amount of the first mortgage bonds of the Huntingburg, Tell City and Cannelton Railroad Company, hereby request the American Loan and Trust Company, trustee under the mortgage securing said bonds dated October 1, 1887, to proceed at once to have a receiver appointed of the property securing said bonds, and to foreclose said mortgage.                    William T. Hart,
                                        "John M. Graham,
                                        "John Stites,
                                                "Committee."

At that time the committee represented the following holders of the bonds of the Huntingburg Company, to wit: Nathaniel W. Bumstead, $10,000; John Goldthwait, $10,000; William T. Hart, $27,000; Eleazer D. Chamberlain, $10,000; Albert H. Rhodes and Enid L. Ripley, $18,000; Arioch Wentworth, $100,000; Sarah E. Carey, admin-

istratrix, $15,000; and Rachel Lee, $6,000,—in all, $196,000. On November 28, 1896, a petition was filed by the New York Security & Trust Company, in the pending foreclosure suits brought by it and the American Loan & Trust Company and Noble C. Butler, for an order directing the receiver to discontinue the operation of the Huntingburg Road, or for the delivery of the same to the trustees under the mortgage of October 1, 1887, covering said property. This motion was opposed on behalf of some of the bondholders and the trustees at the time of the hearing on said petition. Said trustees could have had said mortgage of October 1, 1887, foreclosed, and a sale made thereunder, long before, and at any time since, said petition was filed.

On these facts the petitioners insist that they are entitled to a decree of the court compelling the New York Security & Trust Company and George T. Jarvis, receiver, to deliver to them, severally, in exchange for the bonds held by them against the Huntingburg Company, a like amount of the consolidated first mortgage bonds bearing date July 1, 1889. The theory of the petitioners is that by the agreement of consolidation the trust company and the receiver are trustees for the benefit of the bondholders of the constituent companies, and that the bondholders of the Huntingburg Company have thereby acquired a vested right in and to 300 bonds issued under that agreement, which may be enforced against the trustee and the receiver. These 300 bonds were to be used by the board of directors of the consolidated company in taking up, and in satisfaction of, the bonds of the Huntingburg Company, and in the redemption thereof. It would not seem that this conferred any absolute right on the bondholders of the Huntingburg Company to insist on the delivery in specie to each of them severally of as many of the consolidated bonds as should be equal to the number of the Huntingburg Company's bonds held by each of them, respectively. If the consolidated bonds could have been sold for a sum in excess of the amount necessary to take up, satisfy, and redeem the Huntingburg Company's bonds, no reason is perceived why the directors were not at liberty to make such sale. It would seem that the agreement of consolidation ought not to be construed to secure an absolute right of exchange to each bondholder of the Huntingburg Company's bonds, because, if this were so, it would probably defeat the purpose intended to be accomplished. The object to be attained was to procure an exchange of 300 bonds, of $1,000 each, bearing 6 per cent. interest, for a like number of bonds, each of the like amount, bearing 5 per cent. interest only. The former bonds constitute the first lien on the Huntingburg Road, and if less than the whole amount were to be taken up, satisfied, and redeemed, leaving the residue as the paramount lien on the road, it would seem hardly reasonable to suppose that the holders of such residue would be willing to surrender a better security for a poorer one.

It is true that the consolidated company, by taking the property, franchises, and effects of the constituent companies, became bound for the indebtedness of each, to the extent of the property received by it from each, but to no greater extent. In order to facilitate the

refunding and consolidating of the debt of the constituent companies, and for their own advantage, they mutually agreed that new bonds should be issued, bearing a lower rate of interest, and a new mortgage executed by the consolidated company upon the several properties acquired by it, to secure the payment of such bonds. For this purpose the bonds were issued, and the mortgage executed and deposited with the trust company. In the agreement of consolidation there is no undertaking by the consolidated company to assume or pay the outstanding bonded indebtedness of the constituent companies. Nor is there any express stipulation binding the consolidated company to make the exchange of bonds, but, on the contrary, the agreement contemplates that they may not be exchanged. It is provided that, in case the bondholders shall neglect or refuse to make the exchange, the directors may make such arrangements as to them may seem best adapted to secure the interests of the consolidated company. It received no property from the constituent companies which it undertook to account for or deliver to, or for the benefit of, the bondholders. The agreement of consolidation was solely with, and primarily for the benefit of, the constituent companies, and not with, or for the benefit of, the present petitioners. The exchange of bonds provided for might prove advantageous or detrimental to the bondholders. They alone were to determine that question. It suffices to say that their interests were not considered, nor were they consulted. Whether any exchange would be made was left for future determination by the bondholders themselves. Until an agreement for exchange had been made, no new contract between them and the consolidated company could exist In any event, the agreement of consolidation contemplated a new contract before any actual exchange. No party to that agreement had the right, nor did it assume to have authority, to bind the directors of the consolidated company or the bondholders of the constituent companies. If it were conceded (and it is not) that the constituent companies may have had originally the right to insist that the trustees should carry out the agreement for exchange, it is certain that, since 1894, when they passed into the hands of a receiver, they cannot assert any such right. The petitioners must stand upon their own rights, and their rights were not considered, except, possibly, incidentally, in the agreement of consolidation. They cannot avail themselves of the agreement, except by the consent of the contracting parties; and the agreement of the contracting parties may be abrogated or varied to suit themselves, without consulting the bondholders, at any time before an agreement for exchange has been made. The right of the petitioners, in its most favorable aspect, is simply a right of exchange, within a reasonable time, on the terms provided for. To assume that the petitioners acquired a present interest in or title to the 300 consolidated bonds, or any of them, by virtue of the consolidation agreement, is to confound settled legal principles. When the owner of property subject to a mortgage conveys the same by a deed containing no assumption or agreement to pay the incumbrance, the mortgagee's rights and remedies remain unaffected. In case the purchaser assumes and agrees

to pay the incumbrance, the contract of assumption is made for the benefit of the mortgagee and the protection of the mortgagor, and, as between purchaser and seller, the former becomes the principal, and the latter the surety, in respect to the incumbrance the payment of which has been assumed. A suit in equity is maintainable by the mortgagee on the contract of assumption for the purpose of avoiding circuity of action. The equity upon which the mortgagee depends for relief is the right of the mortgagor against his vendee, to which he is permitted to succeed by substituting himself in place of the mortgagor. It is settled that such mortgagee has no greater right than the mortgagor has against the vendee. Keller v. Ashford, 133 U. S. 610, 623, 624, 10 Sup. Ct. 494. Though the assumption of the mortgage debt by the subsequent purchaser is absolute and unqualified in the deed of conveyance, it will be controlled by a collateral contract made between him and his grantor which is not embodied in the deed. The right of the mortgagee to enforce payment of the mortgage debt, either in whole or in part, against the grantee of the mortgagor, does not rest upon any contract of the grantee with him, or with the grantor for his benefit. Recovery in such a case against the subsequent purchaser is adjudged in a court of equity to a mortgagee not in virtue of any original equity residing in him, but by a mere rule of procedure he is allowed to go directly as a creditor against the person ultimately liable, in order to avoid circuity of action, and to save the mortgagor, as the intermediate party, from being harassed for the payment of the debt, and then driven to seek relief over against the person who has indemnified him, and upon whom the liability will ultimately fall. The consolidated company did not assume or agree to pay the debt of the petitioners. Their rights and remedies on their bonds remained unaffected by the terms of the consolidation agreement, which gave them no right to or equity in the consolidated bonds. But, if originally this were otherwise, in the long lapse of time the situation of the parties to the agreement of consolidation has so changed that it would be inequitable, as between them, specifically to enforce the contract; and, unless the contract ought to be now enforced between the parties to that agreement, it cannot be enforced in favor of the petitioners.

Besides, a stranger to a contract, who did not know of or assent to it at the time it was made, and has not done or omitted any act on the faith of it, cannot maintain an action upon it. Willard v. Wood, 135 U. S. 309, 314, 10 Sup. Ct. 831. The petitioners allege that no notice was ever issued by any railroad company offering the first consolidated mortgage bonds of the consolidated company to the holders of the Huntingburg bonds in exchange for their bonds. This being so, it brings their case within the principle that an instrument which in express terms contains an offer of a contract cannot be accepted by the person for whom the offer is apparently intended before such offer is communicated to him by some act of the alleged offerer. James v. Bottle Co., 69 Mo. App. 207; Shaw v. Stone, 1 Cush. 228, 244; Dunham v. City of Boston, 12 Allen, 375; Sears v. Railway Co., 152 Mass. 151, 25 N. E. 98. If there ever

was any offer, it was made on May 21, 1889, to exchange bonds bearing 5 per cent. interest for Huntingburg bonds bearing 6 per cent. interest. The holders of the latter bonds have received 10 semiannual installments of interest since the offer was made, and, while retaining the excess of interest, after the lapse of nine years they severally insist on their right to enforce an exchange; and that, too, while the constituent and consolidated companies have passed into the hands of a receiver. They have slept upon their rights for nine years, during which time their acts have been entirely inconsistent with the right now asserted. The circumstances have so changed that it would be inequitable to creditors having inferior liens that the right of exchange should be decreed; and their long delay, accompanied with inconsistent acts, would be fatal to their case in a court of equity, even if there were no intervening rights of other creditors. The delay of nine years, unexplained and unexcused as it is, would of itself bar the petitioners from the relief demanded. Hoyt v. Sprague, 103 U. S. 613; Randolph's Ex'r v. Quidnick Co., 135 U. S. 457, 10 Sup. Ct. 655; Sullivan v. Railroad Co., 94 U. S. 806; Catlin v. Green, 120 N. Y. 441, 24 N. E. 941; Finch v. Parker, 49 N. Y. 1. There is neither averment nor proof that the petitioners could not, by the exercise of ordinary diligence, have learned of the existence and terms of the agreement of consolidation within a reasonable time after it was executed. It is difficult to avoid the conclusion that they were inexcusably negligent in failing to learn of the agreement of consolidation until nine years had elapsed. When the fact of a long lapse of time is admitted or established, the burden is devolved upon those who have allowed this time to pass to show that they made diligent inquiry, or were in some way, by the fault of the adverse party, induced to refrain from inquiry, if they would avoid the imputation of laches. As was said in Marsh v. Whitmore, 21 Wall. 178, 185, the party against whom by long lapse of time a presumption of laches arises "should set forth in his bill specifically what were the impediments to an earlier prosecution of the claim," and, if he does not do so, he can have no relief in a court of equity. Godden v. Kimmell, 99 U. S. 201; Mackall v. Casilear, 137 U. S. 556, 566, 11 Sup. Ct. 178; Hanner v. Moulton, 138 U. S. 486, 492, 11 Sup. Ct. 408; Sullivan v. Railroad Co., supra. In Hanner v. Moulton, supra, it was held that it was sufficient to establish laches that the plaintiffs "had the means of knowing." The court cited with approval Rowe v. Horton, 65 Tex. 89, and Parish v. Alston. Id. 194, where it was held that the action was barred by laches, because the plaintiff might by reasonable diligence have sooner discovered the mistake which was the alleged ground of relief, although it was not in fact discovered until within a few months before the suit was brought. In Woolensak v. Reiher, 115 U. S. 96, 5 Sup. Ct. 1137, the court held that a party who would avoid the imputation of laches must show that he made inquiry and examination with that reasonable degree of care which is habitual to, and expected of, men in the management of their own interests in the ordinary affairs of life, and that the law would impute knowledge when oppor-

tunity and interest, combined with reasonable care, would neces-. sarily impart it. In Godden v. Kimmell, supra, it is said:

"The rule is that a cestui que trust should set forth in the bill specifically what were the impediments to an earlier prosecution of the claim, and how he or she came to be so long ignorant of their alleged rights, and the means used by the respondent to keep him or her in ignorance, and how he or she first came to the knowledge of their rights."

To the same effect is Badger v. Badger, 2 Wall. 87, 95. The petitioners have wholly failed to make out a case within the foregoing rule.

Other reasons are urged in bar of the petitioners' right to the relief sought by them, which the court does not deem it necessary to consider. For the foregoing reasons the exceptions to the master's report must be overruled, and his report approved. A decree may be entered accordingly.