## PRATT *v.* CALIFORNIA MIN. CO.

*(Circuit Court, D. Nevada.* November 17, 1883.)

1. **CONVEYANCE TO ASSOCIATION—PERSONS NOT NAMED.**
   When land is conveyed to an association of persons without naming all of them, the court may inquire and determine what persons composed the association at the date of the deed, and the interest to which each would be entitled in the land.

2. **SAME—INTERESTS—ACTS OF PARTIES.**
   The acts of the parties in disposing of the property may be considered as showing their understanding of their interests therein at the time the deed was made.

3. **LACHES AS DEFENSE IN EQUITY.**
   No formal pleading of the statute of limitations is necessary to raise a defense of laches in equity. It may arise upon the bill or upon the evidence as produced by the complainant.

4. **SAME—CHARACTER OF PROPERTY.**
   Where the property in litigation is of a speculative and fluctuating value, the parties interested will be held to a greater degree of diligence in asserting rights therein than where it is of permanent and fixed value.

In Equity.

*W. E. F. Deal* and *J. F. Lewis,* for complainant.

*R. S. Mesick,* for defendant.

Before SAWYER and SABIN, JJ.

SABIN, J. The complainant in this suit alleges that he is the owner of thirteen feet and one and one-half inches of mining ground, undivided, described in his bill, situated on the Comstock lode, in Virginia City, Storey county, Nevada, the same being a portion of that certain mining ground and claim known as and called the California claim; that he has been such owner thereof since December 22, 1859; that

defendant owns the remainder of said mining claim or ground, and holds the same as tenant in common with complainant; that defendant has removed from said mining ground ores to the value of $30,000,000 and upwards, which it has converted to its own use. Complainant prays to be adjudged to be the owner of said thirteen feet and one and one-half inches of said mining ground or claim, for partition thereof, for an accounting, and for general relief.

The answer denies all right, title, or interest of complainant in and to said ground, or any part thereof. It is full and responsive to the bill, and contains substantive averments by way of defense, which need not be here recited. The answer admits that defendant has removed ores from said mining claim of the value of $20,000,000, which admission is accepted by complainant, and no evidence was taken thereon. It also admits that complainant has received no part of the proceeds of said ores, and denies all right in him thereto.

It is admitted, and so stipulated, that whatever interest or estate complainant ever had or now has in said mining ground was acquired by him through and by virtue of a certain deed executed by James Walsh, dated December 22, 1859, submitted in evidence as complainant's Exhibit No. 4. This deed, so far as material to this case, reads as follows:

"For and in consideration of six thousand dollars paid to me by an association of persons now owning and running a water-mill for the purpose of crushing quartz on Carson river, about one and a half miles above China Town, on said river, in the territory of Utah and county of Carson, said association originally consisting of Joseph Woodworth, Mr. Hastings, Mr. Pratt, Mr. Wilson, and myself, I have this day sold and quit claimed to said association my one-fourth, undivided, of," etc. [Describing the property.]

This deed was duly executed and recorded December 22, 1859. Both parties to this suit derive title to the ground in controversy through this deed.

The defendant, in its answer, avers that one William Stuart was a member of that association on the date of said deed, and that he took an interest in the property conveyed of one-twentieth of all the ground so conveyed to the association; and it further avers that complainant's interest in said ground was never one-fifth thereof, but only one-twentieth thereof. And upon these averments of the answer arise the real issues decisive of this case.

It is necessary for us, then, to determine these two questions of fact upon the evidence submitted: (1) Who composed that association on the twenty-second of December, 1859? (2) What interest or estate did each member thereof respectively take in the property conveyed by this deed?

It is conceded by both parties that Walsh and the four persons named in the deed were members of the association at the date of the deed, and took under it. It will be observed that the deed runs, not to the persons named, but to "said association." A presumption

might arise that the persons named as the original members of the association were the only members thereof at the date of said deed, though the peculiar phraseology of the deed would suggest the contrary. But when an issue of fact is raised on this very point, the presumption would yield to the truth and fact, as established by the evidence. The evidence on this issue ought to be clear, strong, and convincing.

Complainant's case, as made, rests almost wholly upon his own deposition. That of the defendant has a wider range. It is supported by the depositions of James Walsh, the grantor in said deed, C. H. Fish, and various deeds vesting the title to this mining ground in defendant. We do not deem an extended review of the evidence necessary in this opinion, as it is all of record. Walsh, in his deposition, tells us very clearly and plainly when, where, and how this association was formed; who composed it, and the interest which was allotted to and taken by each member thereof under his deed in the property conveyed. He tells us distinctly that it was composed of Woodworth, Wilson, Hastings, Pratt, Stuart, and himself; that he wrote the deed, but cannot tell how it happened that Stuart's name was omitted therefrom as a member of the association, but that he was such, and took his allotted interest under his deed. Strongly corroborative of this statement is the fact that, within six months from the date of that deed, Walsh paid Stuart $3,500 for the very interest which Stuart acquired in this property by this deed of Walsh to this association.

The deeds submitted in evidence by defendant, conveying the various alleged interests of all these parties in this ground, strengthen and confirm the deposition of Walsh in all material points. Walsh was virtually the "head and front" of this association. He owned this property; had purchased it from Comstock in the month of August, 1859. It is manifest, from all of the evidence, that he and Woodworth were the managers and the controlling spirits of the association. If Walsh did not know who composed this association on the twenty-second of December, 1859, we have no knowledge from the evidence. aside from the deeds, who did compose it on that date. Pratt is wholly silent on this point, as we shall hereafter see. The deposition of Walsh is in harmony with his action subsequent to his conveyance to this association; in harmony with the action of every member of the association in disposing of his interest in this property; in harmony with the declarations made by Woodworth in March, 1860, and in 1865, to Pratt, as to the extent of Pratt's interest in this property; and it is in harmony with all of the deeds made by all of these parties, submitted in evidence, conveying their interests in this property. These deeds were executed in 1860, when all, or nearly all, of these men were on the ground,—when this matter was fresh and clear in their minds. They were not executed with a view of serving as evidence in this case; but they were intended to be, and

doubtless were, absolute verities at the time they were executed, and they are the perpetual record of how all of these six persons then understood this whole matter, both as to who composed the association, and the respective interest of each in this property. And we are compelled, in view of all of the evidence, to give this deposition of Walsh full credence on all material points.

We cannot say this of the deposition of Pratt. He confessedly knew but little of the association or of its affairs at any time, and the lapse of more than 20 years when he gave his deposition had not strengthened or brightened a knowledge originally limited, uncertain, and vague. It is remarkable that in his deposition, covering 64 pages, he nowhere tells us who did compose this association. He testifies that he did not know whether it was formed by any written articles of association or otherwise; whether or not it had or kept any records; who were its officers; what funds it had, or what became of them; how much he or any member contributed to it; or what became of its property after he left Gold Hill, Nevada, in April, 1860. He says they shipped and worked about 100 tons of ore, worth about $250 per ton. His counsel, in his argument, states that this ore ought to have netted the association at least $17,500, yet Pratt does not know what was done with this large sum of money,—seems never to have inquired about it, though entitled, as he claimed, to one-fifth of it. We cannot but think that he stated both the source and extent of his knowledge of this matter when, in reply to a question as to who was present when the association was formed, he says:

"I don't know where they met, and I don't know who were present. All I know, Joe Woodworth told me we had formed a company of five. I was down at Carson river when he told me."

It may serve no useful end to review his evidence at length. Walsh contradicts Pratt on many—nearly every material point; and we cannot but think that Walsh was much the best informed in regard to this association, and all of its affairs, at the dates of which he speaks, and that his testimony is far the most credible. Walsh has no interest in this suit, and his deposition is consistent throughout. See deposition of Walsh, pp. 6–8, 20–23. On the other hand, Pratt's testimony is very unsatisfactory, and sometimes confused and contradictory. See deposition of Pratt, pp. 17–34.

In order fully to understand the strength or weakness of these depositions, they must be carefully studied, compared the one with the other, and both with the documentary evidence in the case, and the subsequent conduct of all of the parties composing the association, not omitting that of complainant himself. And it is permissible for the court to take into consideration the contemporaneous and subsequent action of these various parties in reference to this property, as evincing their construction and understanding of their respective rights and interests under this deed executed by Walsh to this association. *Mulford* v. *Le Franc*, 26 Cal. 88; *Steinbach* v. *Stewart*, 11

Wall. 576; *Hamm* v. *City of San Francisco,* 9 Sawy. 31; S. C. 17 Fed. Rep. 119.

After careful examination of all of the evidence, we are convinced, and so find and hold, that on the twenty-second of December, 1859, the association to which Walsh conveyed this property, by his deed of that date, was composed of Joseph Woodworth, James Walsh, J. W. Hastings, Metcalf Pratt, complainant, George Wilson, and William Stuart, and that they each took an interest in the property conveyed.

We pass to the second question: What interest did each take in this property? The presumption arising from the deed, unexplained, would be that they took in equal shares or proportions. This, however, is but a presumption, and may be overcome by evidence not necessarily inconsistent with the deed, in the same manner that a deed, absolute on its face, may be shown to be only a mortgage, or that a legal title may be shown to be held by the grantee in trust, or that property, apparently community property, may be shown to be the individual property of either spouse. In either case, the extent of the interest or estate may be inquired into and determined.

Much that we have said, in our review of the evidence, as to who composed this association, applies as to the interest which each member thereof took in this property. Walsh tells us, in his deposition, that when he and Woodworth decided what property they would give these men an interest in, they allotted to each his share or interest in the property; that Woodworth and himself reserved each a three-eighths interest, Hastings was given a one-tenth interest, and Pratt, Stuart, and Wilson, a one-twentieth each; and that Woodworth informed the men of their respective interests, and had the deed recorded. Now, the deeds in evidence show that this was true, and that each member of that association then so understood the matter, and each one thereafter conveyed just his allotted share or interest, and never claimed any other than his allotted interest in this property, except complainant. Is it possible that all of these five men were mistaken as to their interests, not one of them correct, when they were all at work together, knew the property, and were on the ground, and that Pratt, who confessedly knew but little of the association or of its affairs, is alone correct?

These deeds, executed in 1860, seem much more convincing than the confused statement of an interested witness made long subsequent thereto. Walsh conveyed this property to this association December 22, 1859. On March 23, 1860, Pratt, complainant, conveyed to Woodworth one-twentieth of this property, his allotted interest. July 23, 1860, Hastings conveyed to Woodworth one-tenth of this property, his allotted interest. August 16, 1860, George Wilson conveyed to King and Othel his one-twentieth interest in this property. There was a mistake evidently in the first deed executed by Wilson, and another deed was executed by Wilson and wife, August 27, 1860, to

King and Othel, corrective of the first deed. September 15, 1860, Stuart conveys to Walsh his one-twentieth of this property. Walsh, by two deeds to Sparrow, of date September 9, 1860, and October 9, 1860, and by one deed to Barron, conveys his original three-eighths interest in this property and the twentieth interest purchased from Stuart. In the deed of Walsh to Sparrow of September 9, 1860, after mentioning this association, is this recital: "My interest in the property of said association being originally three-eighths of the whole." Woodworth joins with others in conveying all of their interests in this ground to the grantors of defendant, and hence no particular description appears in this deed of the specific interest conveyed by Woodworth.

These deeds confirm the deposition of Fish as to the sources whence defendant derived title to this property, and the interest conveyed by each member of that association. It is more than probable that, could we have the testimony of Woodworth on this point, it would confirm the testimony of Walsh and these deeds. Pratt testifies repeatedly that Woodworth told him that he, Pratt, owned only a twentieth interest in this property. He told him this when he purchased his interest in 1860, and repeated it in 1865. There is no support for the suggestion that this association was a purchaser of this property for value. The interest conveyed to each was evidently a gratuity, and was so understood by them all, as is shown from the fact that each disposed of his allotted interest, and never claimed any other or greater interest therein, excepting complainant. Pratt testifies that he contributed his labor and expenses to the association. Walsh testifies that he understood that all of the men were paid, and thinks they were; and it is undisputed that Walsh sent $200 to Woodworth, by Pratt, with which to pay Pratt for his labor just before he left, in November, 1859, to return to his home at Grass Valley, California. We think the evidence settles as clearly what the interest of each of these persons was in this property as it does the fact who composed the association. And from it we find and hold that Woodworth and Walsh each took and held, under this deed to the association, a three-eighths interest in the property conveyed; that Hastings took and held a one-tenth interest therein; that Wilson, Pratt, (complainant,) and Stuart each took and held a one-twentieth interest therein, and no more.

It is conceded that Pratt conveyed to Woodworth one-twentieth of this mining ground, by his deed of March 23, 1860. It follows, therefore, from our decision on the last question, that he then conveyed away all of the interest or estate which he ever had in this association property. And we cannot resist the belief that he well knew at the time of the sale of his interest that he was parting with his entire interest in the property. Woodworth assured him then that he was so doing; and he had a right to believe Woodworth, for he tells us virtually that Woodworth had told him all he ever knew of the asso-

ciation. If, however, there could be any doubt on this point, the conduct of Pratt for more than 21 years after this conveyance, in reference to this property, would seem to place that doubt at rest. In August, 1860, he was at Gold Hill, and received from Woodworth $500, the balance due on the purchase money of his interest in this property. He goes away; abandons this and all other interests which he then had at Gold Hill; keeps watch of this property; knows its great value; talks about it; knows that defendant is in possession of it, and working it; and yet for 15 years he never even demands his interest in it. At the end of that time he makes demand, is denied, and again goes away and is silent for more than six years longer before attempting to assert his alleged rights. This is not the usual conduct of men where great interests are at stake, who are strong in the belief of their rights, and diligent in the assertion of them. His conduct, during all of this time, was just such as we might expect of a man who knew that he had parted with his entire interest in the property, and regretted that he had done so.

Another matter of defense is urged upon our attention, to-wit, the staleness of plaintiff's claim. And we consider it, since if we are wholly wrong in our determination of the questions of fact involved in this case, we still think that, in view of complainant's laches, neglect, acquiescence, and delay in the assertion of his alleged rights, he has no standing in a court of equity to demand the relief sought, or any relief. Upon this point, complainant's counsel insist "that the statute of limitations of Nevada must control the court in the determination of this question." We do not view the subject in this light; but if counsel's position be true, it seems to us that it is absolutely fatal to complainant's standing. The statute of limitations has little, if anything, to do with this defense—that of complainant's laches—unless by way of analogy. This defense arises independently of the statute, and may arise either upon the bill of complaint as presented to the court, or upon the whole case as disclosed by the evidence.

We will, for a moment, consider the statute of limitations of Nevada. By this statute, the limitation for the recovery of a mining claim, or the possession thereof, is fixed at two years; that of other realty, at five years. The statute also declares what shall be considered adverse possession of a mining claim. We presume it will hardly be contended, under this statute, at least, but that defendant and its grantors have been in the adverse possession of this ground since 1860, when it acquired title thereto and went into possession thereof. See *Abernathie* v. *Con. Virginia M. Co.*, 16 Nev. 260, and cases there cited. But if this be denied, it certainly must be conceded that defendant has been in adverse possession of this ground since April, 1875, the time when Pratt made his demand, whatever that demand was, and was denied any interest in this property.

The bill of complaint virtually alleges an ouster of complainant, but does not fix the date thereof; but this is supplied by the evidence.

The answer virtually avers the same thing. The bill alleges a demand by complainant upon defendant for his interest and estate in this property, and for an accounting; that defendant has refused the same, and denies "that plaintiff has, holds, owns, or is entitled to any interest whatever in or to said premises, or any part thereof." This denial by defendant of all participation by complainant in the rents and issues of the property, coupled with a denial of all right or interest of complainant in the property itself, is, as between co-tenants, equivalent to actual ouster; and such ouster would be found from the date of such denial. Freem. Co-tenancy, §§ 235, 242; *Abernathie* v. *Con. Virginia M. Co., supra.*

This denial is fixed by the evidence as early, at least, as April, 1875,—even if it is not fixed as early as March 23, 1860,—when Pratt's further interest in the property was denied by Woodworth, and all possession thereof by Pratt ceased. If, then, this court is controlled, in the matter of this defense, by this statute, what possible standing has plaintiff in court? In limiting the recovery of mining claims to two years, and extending it to five years as to other realty, the state has declared its fixed policy,—has said that it would not tolerate unreasonable delay,—and it charges upon all persons, at their peril, that they be diligent in the prosecution of all mining rights and interests. There is wisdom in this policy and law of the state, and we see no reason why it should not be enforced in this or any proper case. In the case before the court, the bar of the statute is not invoked by formal plea. Defendant, being a foreign corporation, could not, under the rulings of the supreme court of Nevada, plead the statute in this action had it desired to do so. This, however, is of slight significance. As we have observed, this defense arises independently of the statute of limitations. The doctrine of laches in equity courts is much older than any statute of limitations. The jurisdiction of equity courts was established by act of parliament in 1349, though these courts had existed long prior thereto, with a somewhat uncertain jurisdiction. The statute of limitations of James I. was enacted in 1624, nearly 300 years after the establishment of equity courts by act of parliament. In *Smith* v. *Clay*, 2 Amb. 645, decided in 1767, Lord CAMDEN says:

"Laches and neglect are always discountenanced; and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court."

On this subject, however, it will be amply sufficient to call attention to rulings of the supreme court of the United States upon the defense here urged. In *Badger* v. *Badger*, 2 Wall. 87, a case strongly analogous to the case at bar, the court says:

"Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitations which govern courts of law in like cases, and this rather in obedience to the statutes than by analogy. In many other cases they act upon the analogy of the like limitations at law. But there is

a defense peculiar to courts of equity, founded on lapse of time and staleness of claim, where no statute of limitations governs the case. In such cases courts of equity, acting upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hinderance or impediment caused by the fraud or concealment of the parties in possession, which will appeal to the conscience of the chancellor. The party who makes such appeal should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer."

In that case the bill was dismissed in the lower court, on the ground of complainant's neglect and delay in the prosecution of the demand. And in affirming that decree, the court further says:

"If a further reason were required for affirming this decree, it might be found in the statute of Massachusetts, [the statute of limitations.] * * * But we prefer to affirm the decree for the reasons given, without passing any opinion on the effect of this statute."

In *Sullivan* v. *Portland, etc., R. Co.*, 94 U. S. 811, this subject is further discussed. In this case, the bar of the statute of limitations was not pleaded. The court says:

"To let in the defense that the claim is stale, and that the bill cannot therefore be supported, it is not necessary that a foundation shall be laid by any averment in the answer of the defendants. If the case, as it appears at the hearing, is liable to the objection by reason of the laches of the complainants, the court will upon that ground be passive and refuse relief. Every case is governed chiefly by its own circumstances; sometimes the analogy of the statute of limitations is applied; sometimes a longer period than that prescribed by the statute is required; in some cases a shorter time is sufficient; and sometimes the rule is applied where there is no statutable bar. It is competent for the court to apply the inherent principles of its own system of jurisprudence, and to decide accordingly. A court of equity, which is never active in giving relief against conscience or public convenience, has always refused its aid to stale demands, wherever a party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court."

In *Twin-lick Oil Co.* v. *Marbury*, 91 U. S. 587, the court adverts to the character of the property involved, and the relative obligation of diligence resting upon those claiming rights or interests therein. The court says:

"The fluctuating character and value of this class of property [oil mining property] is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing tomorrow; and that which would to-day sell for a thousand dollars, as its fair

value, may, by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much daily. The injustice, therefore, is obvious of permitting one holding the right to assert the ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit. While a much longer time might be allowed to assert this right in regard to real estate whose value is fixed, on which no outlay is made for improvement, and but little change in value, the class of property here considered, subject to the most rapid, frequent, and violent fluctuations in value of anything known as property, requires prompt action in all who hold an option whether they will share its risks or stand clear of them."

The delay in this case was less than four years, and in affirming the decree of dismissal of the lower court, the court further says:

"We think, both on authority and principle,—a principle necessary to protect those who invest their capital and labor in enterprises useful but hazardous,—that we should hold that plaintiff has waited too long."

See, also, *Hayward* v. *National Bank*, 96 U. S. 611, and cases there cited; 2 Story, Eq. Jur. § 1520, and note 4; Story, Eq. Pl. § 813, and note; 1 Pom. Eq. Jur. §§ 420, 421; *Gottschall* v. *Melsing*, 2 Nev. 185; *U. S.* v. *Flint*, 4 Sawy. 80; *Manning* v. *San Jacinto Tin Co.*, 7 Sawy. 418; S. C. 9 Fed. Rep. 726; *Dammeyer* v. *Coleman*, 8 Sawy. 51; S. C. 11 Fed. Rep. 97; *U. S.* v. *Tichenor*, 8 Sawy. 142; S. C. 12 Fed. Rep. 415; *Hart* v. *Clarke*, 19 Beav. 349; S. C. 6 H. L. Cas. 655; *Clements* v. *Hall*, 24 Beav. 333; *Hart* v. *Clarke*, 6 DeG., M. & G. 232; *Norway* v. *Rowe*, 19 Ves. Jr. 144.

Now, what was the complainant's conduct in regard to this property, from the time he sold this interest, in March, 1860, to the time of the commencement of this suit, a period of nearly twenty-one years and a half? There can be no dispute on this point, for we take his own statement thereon. Immediately after selling this interest, March 23, 1860, he returned to his home at Grass Valley, California, to look after his mines there; returned to Gold Hill, Nevada, in August of the same year, and collected $500 due him from Woodworth; returned then to Grass Valley; remained there until 1870, when he went to Mineral Hill, Eureka county, Nevada, where he remained at work for wages until 1881, when he went to Idaho territory, returning from there to testify in this case. In April, 1875, he visited Virginia City, called at the office of defendant, and demanded his interest in this property, and was refused. He returns to Mineral Hill, waits six years and a half longer, and then brings this action. When asked by defendant's solicitor why he had not looked after this property, his answer is, "Because I neglected it." And when asked how he came to neglect it, he says, "It was through my carelessness; that's all." When questioned further by his own solicitor on this point, he tells us that he never had the necessary means from April, 1860, to the time he gave his deposition with which he could assert his rights to this property. And then, as if in travesty of his last statement, he tells us that he did commence this action without advancing a dollar,

and that the only expense he had been to was in coming from Idaho territory to testify upon the hearing before the commissioner. For twenty-one years and a half he was so poor that he could not do anything towards asserting his rights, but at the end of that time he could bring suit and press it to judgment without expense or liability.

Now, this excuse is without merit, if not untrue. It is a fair inference from the testimony that Woodworth paid Pratt $1,000 at the time he purchased his interest, March 23, 1860. In August following, Pratt tells us that Woodworth paid him $500, balance due for purchase money. He could certainly then have commenced suit for this property, and this was the very time when he should have done so, when the witnesses were all there, and before the property had passed to innocent purchasers in good faith. He tells us he owned valuable mines at Grass Valley, California, worked for wages when he wished to do so, and during his 10 or 11 years at Mineral Hill, he had accumulated between $1,500 and $1,600. We do not believe that during these many years, with all of these means and money, and health to labor when he wished to do so, he was still too poor to bring suit to assert his rights. But if he was poor and embarrassed, of which there is no evidence, it was no excuse for his neglect and carelessness. In *Hayward* v. *National Bank, supra*, complainant sought to excuse his delay by reason of his poverty. He said "he felt too cast-away to speak to anybody; could not help himself, nor pay the loan; cared very little about anything." Of this the court says:

"No sufficient reason is given for the delay in suing. His poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights."

In view of the authorities cited and the facts in this case, can it be contended that complainant has shown any excuse for his delay in bringing this action? Diligence is a relative term, and the law justly charges all persons claiming rights or interests in property of a speculative or fluctuating value with a far higher diligence in the assertion of those rights than where the property involved is of a value fixed, permanent, and little changing. The changes in values occurring in a mining town or locality in five or ten years are often far greater than those which occur in an agricultural community in half a century. Complainant is a miner. He knew the fluctuating, changing, speculative value of mining property. He knew this mining ground was valuable, and advancing in value. He kept watch of it through the papers, talked and corresponded about it with his friends, and knew all this time what was being done with the property; and yet for 15 years he never says a word in assertion of his rights, and then, after demand and refusal, he waits six and a half years longer before doing anything to enforce his alleged rights.

There is no suggestion of any fraud on the part of the defendant in this whole matter. It has lawfully done all that it has done about

this property. It came into the possession of it in 1873, from grantors whose possession runs back to 1860. From that time to the present its possession has been peaceable, exclusive, and adverse to all, unless as to complainant, and certainly adverse to him since April, 1875. By its energy, enterprise, and means it has developed a great mine at great expense and toil and risk. It has taken this vast sum of $20,000,000 from this mining ground, which has been distributed in a thousand different channels. During all this time complainant has stood quietly by, saying nothing, doing nothing, contributing nothing, incurring no expense, risk, or liability, and now demands his alleged distributive portion of this vast sum taken from this property. The demand is without merit, unconscionable, and stale. We have not been cited to, nor have we found, a single case in any way analogous to this where any relief has been granted by a court of equity.

Let decree be entered dismissing complainant's bill, with costs.