Argued 27 March; decided 24 April, 1899.

## LOOMIS *v.* ROSENTHAL.

[57 Pac. 55.]

LIMITATION OF ACTIONS—LACHES—EQUITY.—While the statute of limitations is not a defense in equity, still the claimant must have exercised reasonable diligence in asserting his claim after ascertaining the fraud complained of, or after learning of facts which would put a person of ordinary intelligence on inquiry: *Raymond* v. *Flavel*, 27 Or. 219, and *Sedlak* v. *Sedlak*, 14 Or. 540, cited.

LACHES—STALE DEMAND.—The purchaser of land at an administrator's sale held notorious and exclusive possession of it nineteen years, and fifteen years after the youngest heir became of age. The heirs lived in the same neighborhood, knew their father had owned the land, and visited the purchaser's family, and were notified of the administrator's sale. The purchaser cut the timber, erected costly buildings, and contributed a large sum towards bringing an electric railway from the city to the premises, and the land rapidly increased in value. The deeds showing the transactions were of record. *Held*, that the heirs were guilty of laches preventing their recovery of the land, notwithstanding no notice of the appointment of the administrator was served on them.

From Multnomah :   Loyal B. Stearns, Judge.

This is a suit by Katie J. Loomis and Olive F. Swafford against Lewis and Caroline Rosenthal to establish a trust in real property, to set aside certain conveyances thereof, and to recover the rents and profits arising therefrom. The material facts are that on February 21, 1860, one J. V. Clary, being the owner in fee simple of the northwest ¼ of section 33, in township 1 north, of range 2 east of the Willamette Meridian, in Multnomah County, executed with his wife, Barbara A., a mortgage thereof to Messrs. Ladd & Tilton, bankers, to secure the payment of the sum of $300, payable six months from that date, with interest thereon, after maturity, at the rate of five per cent. per month, which was duly recorded in the records of mortgages of said county.   Clary and his wife having moved off the premises, the latter, on October 21, 1861, for the expressed consideration of $135, executed to the defendant Lewis Rosenthal what purported to be a bargain and sale deed thereof, in pursuance of which he moved thereon in 1862, remaining in possession only a few months, but returned thereto in 1865, since which time he has been constantly in the possession thereof.   J. V. Clary died intestate March 12, 1862, leaving the said Barbara A., now the wife of H. C. Baugher, and three daughters, who, since the death of their father, have married, and whose names and date of birth are as follows :  Olive Swafford, May 15, 1856 ; Lola Lane, April 16, 1859 ;  and Katie J. Loomis, February 6, 1861,—who still survive.   Rosenthal and wife, on November 3, 1863, executed to one H. F. Bloch a mortgage of said land to secure the payment of a promissory note, purporting to have been executed May 12, 1862, for the sum of $1,500, with interest thereon at the rate of two per cent. per month, and Ladd & Tilton exe-

cuted to Bloch, on November 5, 1863, an assignment of the said Clary mortgage, and the same was recorded in the records of mortgages of said county.

On April 6, 1871, Rosenthal and wife, for the expressed consideration of $800, executed to one B. Goldsmith a quitclaim deed of said land, reciting therein that the interest intended to be conveyed thereby was the dower right of Barbara A. Clary. Rosenthal, having been appointed administrator of the estate of J. V. Clary, deceased, obtained an order of the county court of said county, in pursuance of which he, on March 18, 1871, sold said land for the sum of $1,800 to Bloch, and, said sale having been confirmed by an order of the county court, the administrator, on April 14, 1871, executed to the purchaser a deed to the premises. Bloch and wife, on April 18, 1871, for the expressed consideration of $1,800, executed a quitclaim deed to Goldsmith, who, with his wife, on April 26, 1876, in consideration of $1, conveyed said premises by a like deed to Rosenthal. The tax levied upon said land for the year 1873 becoming delinquent, the premises were sold to satisfy the same to one William Barnes, who, on September 18, 1890, conveyed to Rosenthal all the interest that he thereby acquired. Barbara A. Baugher and Lola Lane having conveyed their respective interests in said premises to Katie J. Loomis, she, with her sister Olive Swafford, instituted this suit, alleging in their complaint the facts, in substance, as hereinbefore detailed, and that Rosenthal, as a part of the consideration for Barbara A. Clary's deed, agreed to satisfy the Ladd & Tilton mortgage, but that he neglected to do so, and, in order to defraud the heirs of J. V. Clary, procured said mortgage to be assigned to Bloch, to be held in trust for him; that he secured the appointment of administrator of Clary's estate, and had Bloch present said mortgage as a claim

against the estate, and, notwithstanding the statute of limitations had run against the lien, he allowed the claim, amounting to the sum of $1,800 ; and that each of said deeds was executed in pursuance of a plan whereby the several grantees held the title to said real property in trust for Rosenthal, who, without having been discharged as administrator, caused said premises to be conveyed to him, seeking thereby to defraud the *cestuis que trustent* of their estate therein ; and that the reasonable value of the rent of said land for a period of six years immediately preceding the commencement of this suit is $6,000.

As an excuse for the delay in commencing this suit it is averrred as follows : ''That the plaintiffs and said Lola Lane during said times were minors, and wholly unacquainted with the business affairs of their father's estate, and without any knowledge that he had left an estate for them, or that they were entitled thereto ; and they knew nothing of the said fraudulent acts and conduct of the defendant Lewis Rosenthal, or of his fraudulent intent and purpose towards them ; that the said defendant carefully concealed all of his said acts and conduct from them, and covered up his fraudulent purpose and intent by deeds and proceedings of record which appeared to be regular on their face, and which diverted all suspicion from said defendant, and were intended by him to be, and were, misleading ;. and the plaintiffs and said Lola Lane were without any knowledge or any information of said fraudulent acts, purpose, and intent of said defendant until on or about the first day of September, 1891, when they were informed thereof by their attorneys ; that up to said time they were totally ignorant of all said fraudulent acts and conduct by the defendant, and of his intent to defraud them, and were without means of knowledge or information respecting the same ; that,

as soon as they were informed thereof, they began legal proceedings against said defendant Lewis Rosenthal in the Circuit Court of the United States for the District of Oregon, which they prosecuted to final trial, but their bill of complaint was dismissed on the twenty-seventh day of March, 1895, by said court, because said court found and held that the plaintiff Kate J. Loomis was a resident of the State of Oregon when said cause was commenced.'' The defendants, having denied the material allegations of the complaint, averred that all said conveyances were executed and said probate proceedings were had in good faith; that Bloch purchased said land at the administrator's sale thereof for himself, and that there never was any agreement or understanding, directly or indirectly, either before, at, or after said sale, whereby the title to said land should be held in trust for the defendants, or either of them; and that Rosenthal, for more than fifteen years prior to the commencement of this suit, had been in the open, notorious, continuous, adverse possession of all of said land, claiming to own the same in his own right; that he had cleared said land, set out orchards and erected buildings thereon, and contributed the sum of $5,000 towards the construction of an electric railway from the City of Portland thereto. The reply having put in issue the allegations of new matter contained in the answer, a trial was had, and from the evidence taken before a referee the court found the facts in substance as hereinbefore stated, and as alleged in the answer, and that the plaintiffs had been guilty of gross laches in the commencement of their suit, and that they had not established any facts tending to justify such long delay, and thereupon dismissed the suit, and plaintiffs appeal.

AFFIRMED.

For appellants there was a brief over the name of *Thayer & St. Rayner*, with an oral argument by *Mr. Henry St. Rayner* and *Mrs. Mary Leonard.*

For respondents there was a brief over the names of *Dolph, Mallory & Simon, McDougall & Jones,* and *Snow & McCamant,* with an oral argument by *Mr. Joseph Simon* and *Mr. Wallace M. McCamant.*

Mr. Justice Moore, after making the foregoing statement of the facts, delivered the opinion of the court.

It is contended by plaintiffs' counsel that the petition for the appointment of an administrator of the estate of J. V. Clary, deceased, did not state facts sufficient to confer upon the County Court of Multnomah County jurisdiction of the subject-matter; that Clary's heirs were not served with a citation to appear, and show why their ancestor's real property should not be sold to satisfy his debts, and hence said court never acquired jurisdiction of their persons, in consequence of which it was powerless to order a sale of the premises, thereby rendering any attempted sale thereof void. Defendants' counsel maintain, however, that, inasmuch as the complaint nowhere charges that Rosenthal was improperly appointed administrator, the question sought to be presented is not in issue; that, if it were conceded that such sale was void,—which is denied,—the plaintiffs were never devested of their legal estate in the premises, and their proper remedy would have been an action in ejectment, but, having commenced a suit in equity to have Rosenthal declared a trustee, who, by reason of the alleged fraudulent sale of the premises as administrator to himself, holds the title to the land in trust for them, they thereby admit the jurisdiction of the county court,

and the legality of its proceedings in the matter of said estate, and the sale of said property, and hence are precluded from questioning such proceedings.   The argument adduced by defendants' counsel seems logically to support the legal principle for which they contend, but we do not deem it necessary to a decision of the case to consider the questions thus presented by either party, for, if Rosenthal, as administrator, conveyed the premises to any person under an agreement or understanding that the latter would hold the legal title thereto in trust for him, in pursuance of which the land was thereafter conveyed to him, a court of equity would not permit him to take advantage of his own wrong, but would treat him as a trustee for the heirs, whom he had tried to defraud.   If, however, Rosenthal, as such administrator, made a *bona fide* sale of the land to Bloch, and thereafter, in good faith, purchased it in his individual capacity, obtaining a deed therefor, in pursuance of which he made valuable improvements thereon, and has been in the open, notorious, and adverse possession thereof, to plaintiffs' knowledge of their rights, for such a period of time as to render it inequitable to restore the land to them, the deed which Rosenthal obtained being a colorable title to the whole premises, the jurisdiction of the county court and the legality of its proceedings, so far as the administrator's sale is concerned, would be rendered wholly immaterial.

The fraud charged in the complaint as a basis for the relief demanded is that Rosenthal bought the land from Mrs Clary under an agreement to pay off the Ladd & Tilton mortgage ; that, instead of keeping his engagement in this respect, he procured the mortgage to be assigned to Bloch, who undertook to enforce it for his benefit ; and, being the equitable owner of this mortgage, he fraudulently sought and secured the appoint-

ment as administrator of Clary's estate, in pursuance of
which he sold the land to Bloch, who held the title thereto
in trust for him.   Mrs. Baugher, as a witness for plain-
tiffs, in speaking of what her brother-in-law said to her
about Rosenthal's alleged agreement to procure the dis-
charge of the lien upon the premises, says :   "Mr. Kerns
told me at the time of the sale that he would pay the
mortgage off, and pay me a little besides ;   and I got
$135, I think."   Mrs. Rebecca Wells, formerly Mrs.
Kerns, in speaking upon this subject, says :   "As I re-
member, Mr. Rosenthal met my husband, and told him
he wanted to get his property or Mrs. Clary's.   Mr.
Kerns then wrote to Mrs. Clary.   When she came down,
they talked it over at our house, and my understanding
was that Mr. Rosenthal was to pay off the mortgage that
was on the place, and was to pay her a certain amount
of money, if she would sign away her dower, or what-
ever right she had in the place."   Rosenthal testifies
that he never agreed to pay off the mortgage, and that
he did not know of its existence until informed thereof
by Bloch some time after 1865.   It will be observed that
the testimony of Mrs. Baugher and of Mrs. Wells relating
to Rosenthal's alleged agreement is wholly hearsay, and
refers exclusively to what Mr. Kerns said to his wife and
her sister concerning the purchase price of the land.   The
evidence tends to show that when Rosenthal secured Mrs.
Clary's deed the land in question was covered with heavy
timber, except about three or four acres, which was par-
tially cleared, and a small board house built thereon ;
that at the time vacant school land in the vicinity, of
equal or greater value, could have been obtained by any
citizen of the State of Oregon for the sum of $1.25 per
acre, and that Rosenthal paid the full value of the land.
The books of Ladd & Tilton in relation to the mortgage
loan, being offered in evidence, show that on February

21, 1860, J. V. Clary executed to the bank a note, No. 284, for which a credit is claimed on account of cash in the sum of $277.98, and on March 1, 1860, the bank is charged, on account of bills receivable, with note No. 284 in the sum of $300. The books also show the following payments on account of said note: June 9, 1862, $10; August 9—probably the same year—$7.98; and November 3, 1863, $260, in full payment thereof. It is fairly inferable from an inspection of these books that, since Clary's note did not provide for the payment of any interest until after maturity, six months' interest thereon was deducted from the face of the note, and that the maker received the remainder, which was $277.98, the amount charged to cash on account of said note. The books of the bank also show that it received this sum only in full settlement of the note, thus conclusively showing that no interest whatever was paid thereon, notwithstanding the note, at the time it was surrendered to Bloch, amounted to the sum of $678. If the land, in 1863, had been worth more than $277.98, and the costs and expenses of the mortgage foreclosure and the sale of the premises thereunder, it is not at all reasonable to suppose that the bank would have assigned the note for the amount received, and thereby lost the interest on the money loaned for the term of three years, eight months, and twelve days.

During this period of time the country about Portland probably improved somewhat, in consequence of which the value of this tract, together with all other lands in the vicinity of that city, must necessarily have appreciated in some degree; and it is a circumstance tending to show that the land was not probably worth as much at the time Rosenthal secured Mrs. Clary's deed as it was when the note and mortgage were assigned to Bloch.

34 OR.—38.

Nor is this inference dispelled because Ladd & Tilton loaned that amount of money upon the land in question, for the evidence shows that Clary at that time owned another tract of land in the same neighborhood. It is very evident, we think, that Rosenthal never agreed, as a part of the consideration for Mrs. Clary's deed, to pay off the Ladd & Tilton mortgage. He testifies that he understood Mrs. Clary, at the time he obtained her deed, was a widow, which led him to believe that she thereby conveyed her dower right in the premises, and he is corroborated in this respect by the testimony of Mrs. Wells, hereinbefore quoted, and also by the recital contained in his deed of April 6, 1871, executed to Goldsmith. Rosenthal having exchanged a yoke of oxen and a span of horses with Mrs. Clary for her interest in the land, his wife testifies that he gave this stock for a house on the place; thus showing, it would seem, that, while Rosenthal obtained no title whatever by reason of Mrs. Clary's being a married woman, he expected to receive an estate in the land for her life. That Rosenthal never undertook to discharge the Ladd & Tilton mortgage, there is left, in our judgment, but little room for doubt.

The next inquiry is whether Rosenthal procured this mortgage to be assigned to Bloch, who held the lien thereby created in trust for him. The evidence tends to show that in 1861 Rosenthal was very poor, and, with his family, was living on leased land, keeping a few cows, and supplying milk to his customers in Portland; that about that time he became acquainted with Bloch, who was then wealthy, and engaged in the wholesale grocery business in Portland, and, being Jews, a strong friendship sprang up and existed between them, so much so that Bloch loaned him money to buy cows, and also furnished him groceries on credit for his family, and feed for his stock; and on May 12, 1862, being indebted on account

thereof in about the sum of $500 or $600, for which, and future advances expected, he gave Bloch a promissory note for $1,500, to secure the payment of which he and his wife, on November 3, 1863, executed to Bloch a mortgage of said land. This mortgage was executed the same day that J. V. Clary's note was settled at the bank, though the formal assignment of the Clary mortgage was not executed until two days thereafter. That Rosenthal should have executed his mortgage the same day the remainder of the money was paid to the bank, might seem to raise an inference that Bloch was acting in this matter in his behalf. But Rosenthal testified that he never knew of the existence of the Clary mortgage until some time after 1865, and the record contains no testimony tending to contradict him in this respect. When it is remembered that Rosenthal was very poor at that time, and indebted to Bloch in quite a sum, it is but reasonable to suppose that Bloch, believing Rosenthal had a life estate only in the premises, would seek to protect his own interests, and thus secure from Rosenthal the payment of the amount due him, which could best be accomplished by obtaining the legal title to the land, which he knew he could secure by the assignment of the Clary mortgage, which then amounted to more than the value of the land. Bloch being thus obliged to procure an assignment of the Clary mortgage, it is but reasonable to suppose that he did so after obtaining Rosenthal's mortgage; and the circumstance that the Clary note was paid off and the latter mortgage executed on the same day is explainable on a reasonable hypothesis, and does not, in our judgment, tend to show that Bloch was acting in the matter as trustee for Rosenthal, or that he informed the latter about the method he had adopted to secure his debt.

The most important question to be considered is

whether Rosenthal, as administrator, sold the land belonging to Clary's estate under any agreement or understanding that the title should be held in trust for him. Rosenthal testifies that, having made payments to Bloch until he owed him about $800, the latter, anticipating financial difficulties, demanded the amount so due, to settle which he, at Bloch's request, executed a conveyance of all his interest in the land to Goldsmith, who took the title to protect and to hold in trust for Bloch; that, having conveyed his interest in said land, he thereupon leased other lands, and made preparations to move off the premises, but Bloch, having purchased the land at administrator's sale, requested him to remain thereon until he could find a purchaser thereof, agreeing to pay him for clearing the same the sum of $100 per acre, and that the only rent he would demand was to keep the fences in repair; that he accepted this offer, and after remaining on the land as a tenant for about one year, he then for the first time tried to purchase it from Bloch, but did not succeed in consummating a bargain therefor until 1873 or 1874, when it was agreed that he might have the land for the sum of $3,000; that he thereupon sold his cows, realizing therefrom the sum of $700, and, having sold a crop of potatoes to good advantage, he paid the proceeds thereof to Bloch, and on April 26, 1876, having paid the full purchase price, Goldsmith conveyed the land to him. Goldsmith, as a witness for plaintiffs, testified that he had an indistinct recollection that in 1871 Bloch and Rosenthal had a conversation with him regarding some land, and in answer to the direction, "Just state what that recollection is in full and in detail," says: "So far as I remember, Mr. Bloch and Mr. Rosenthal came to me, and asked me to take a deed for some property that was in Bloch's name, and hold it until Bloch would tell me to make a deed for it to Rosen-

thal. They asked me whether I would do it and I told them yes, and they made a deed to me to certain property. I don't remember what it was, but it was some property on the other side of the river; and at the proper time, I suppose, when Bloch told me, I conveyed it to Rosenthal again." On cross-examination this witness says, in substance, that he never looked upon or regarded Rosenthal as an intimate friend, but that Bloch and he were at one time rather intimate, and quite friendly, in consequence of which he took the title to said property on Bloch's account, rather than as Rosenthal's friend; that he did not know there was any agreement or understanding between Bloch and Rosenthal concerning this land, and that the impression that he was to convey the land to Rosenthal might have been based upon the fact that Rosenthal and Bloch came to see him at the same time.

Mrs. Bloch, appearing as a witness for plaintiffs, testified that in consequence of her illness her husband never told her anything about his business affairs, but that on one occasion, in referring to the purchase of the Clary land at the administrator's sale, he said that it had not cost him anything. This witness, in answer to the question propounded on her direct examination, as to when a certain transaction occurred, said: "I don't know. I can't remember. I have no memory any more." Thomas Trengrove, being called as a witness for plaintiffs, in speaking of what Rosenthal told him about his difficulty in keeping the Clary land, says: "And he was talking about it, and he was finally congratulating himself to me that his friends—his Jewish friends—had come to his relief, and he would not be injured on his place; he would still retain it; and they were holding it over for him until such time as he could recover it, as I understood him, from them." Rosen-

thal's wife and several of their children corroborate his
testimony to the effect that when they knew that Bloch
was in failing circumstances, necessitating a sale of their
interest in the land to pay him the amount due, they
made arrangements to move off the premises, and with
that in view they rented land in another neighborhood,
to which they intended to move with their stock; but
that, after the land was sold by the administrator, and
purchased by Bloch, they remained thereon at his request
under an agreement with him to keep up the repairs for
the rent of the land until he could find a purchaser;
that, after having been in possession of the land two or
three years, an arrangement was consummated by the
terms of which it was agreed that it should be conveyed
to Rosenthal upon the payment of the sum of $3,000,
which was fully paid when Goldsmith executed his deed
therefor.  Trengrove is not certain as to the time when
Rosenthal made the declaration attributed to him, which,
in all probability occurred after he had effected an agree-
ment to repurchase the land; and an admission made
at such time is perfectly compatible with the testimony
so given by the defendants.

Mrs. Bloch's testimony is of little value by reason of
her defective memory, and because her husband, in con-
sequence of her sickness, tried to avoid worrying her
with his business cares; and knowing, as she probably
did, that he was financially embarrassed, he might say
that the purchase of the land had not cost him anything,
meaning thereby that he had not paid out any additional
consideration therefor.  Mr. Goldsmith's testimony shows
how indistinct his recollection of the transaction is, and
that he took the title to the property on Bloch's account,
and not by reason of any friendship he entertained for
Rosenthal.  A consideration of the attending circum-
stances leads us to believe that the time Bloch and Rosen-

thal visited Goldsmith, as testified to by him, must have been after the agreement to repurchase the land had been effected between Bloch and Rosenthal. C. O. Hosford, a witness called by plaintiffs, testified on cross-examination that in 1872 or 1873 he tried to buy the Clary land from Bloch, but that they could not agree upon the purchase price, and in answer to the question, "Do I understand you to say that your present impression is that Mr. Bloch offered to sell that property to you at a certain figure, but he stated the title was in Mr. Goldsmith?" the witness said, "I think so." Certified copies of certain portions of the tax rolls of Multnomah County were offered in evidence, and show that the land was assessed in 1871 and 1872 to "Owners unknown;" that the tax roll of that county for the year 1873 could not be found, but that the land was sold for the payment of the delinquent tax of that year to one William Barnes, from whom Rosenthal obtained a quitclaim deed; and that in 1874, 1875, and 1876 the land was assessed to Rosenthal—thus tending to show that Rosenthal effected the agreement to repurchase the land in 1873 or 1874. Every witness who testifies on the subject admits that in 1871 Rosenthal was so poor that he could not have obtained the means necessary to have purchased the land. Senators Dolph and Mitchell were attorneys for the administrator in the settlement of the Clary estate, and each testified, in substance, that he had every reason to believe that Bloch's claim against the estate was just, and that Rosenthal acted in all these matters in good faith. Mr. Benton Killin was appointed and acted as guardian *ad litem* for the plaintiffs, who were then minors, and his testimony is substantially to the same effect. The testimony of these witnesses serves to dispel any doubt that might arise from the consideration of Mr. Goldsmith's testimony, and leads

us to believe that Rosenthal was not guilty of any fraud in the management of said estate, or in the sale of the property belonging thereto.

Assuming, without deciding, that the administrator's deed is void by reason of the lack of jurisdiction of the County Court of Multnomah County to order a sale of the land, can it not be said that plaintiffs' claim to the premises is a stale equity, which is barred by their laches, when it is remembered that Rosenthal, for a period of nineteen years prior to the commencement of this suit, and for more than fifteen years after the youngest heir became of age, has been in the open, notorious, and exclusive possession of the land, claiming a right thereto under Goldsmith's deed? In *Badger* v. *Badger* 69 U. S. (2 Wall.) 87, it is held that courts of equity, acting on their own inherent doctrine of discharging, for the peace of society, antiquated demands, refuse to interfere in attempts to establish a stale trust, except where (1) the trust is clearly established, and (2) the facts have been fraudulently and successfully concealed by the trustee from the knowledge of the *cestui que trust.* "In order," says Mr. Justice Wolverton, in *Raymond* v. *Flavel*, 27 Or. 219 (40 Pac. 158), "to call into activity a court of equity, there must be an exercise of good conscience, good faith, and reasonable diligence ; and, where time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, the court is passive, and does nothing, because of its inability to do complete justice." To the same effect, see also *Sedlak* v. *Sedlak*, 14 Or. 540 (13 Pac. 452); *Teall* v. *Slaven*, 40 Fed. 774 ; *Naddo* v. *Bardon*, 2 C. C. A. 335, 51 Fed. 493 ; *Pratt* v. *California Mining Co.*, 9 Sawy. 354, 24 Fed. 869 ; *Marsh* v. *Whitmore*, 88 U. S. (21 Wall.) 178 ; *Brown* v. *County of Buena Vista*, 95 U.

S. 157;  *Mackall* v. *Casilear*, 137 U. S. 556 (11 Sup. Ct. 178);  *Hanner* v. *Moulton*, 138 U. S. 486 (11 Sup. Ct. 408);  *Felix* v. *Patrick*, 145 U. S. 317 (12 Sup. Ct. 862);  *Galliher* v. *Cadwell*, 145 U. S. 368 (12 Sup. Ct. 873);  *Johnston* v. *Standard Mining Co.*, 148 U. S. 360 (13 Sup. Ct. 585);  *Abraham* v. *Ordway*, 158 U. S. 416 (15 Sup. Ct. 894).

Assuming that plaintiffs' complaint, hereinbefore quoted, complies with the rule prescribed in *Badger* v. *Badger*, 69 U. S. (2 Wall.) 87, that "the party who makes such appeal should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim ; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance ; and how and when he first came to a knowledge of the matters alleged in his bill ; otherwise the chancellor may justly refuse to consider his case, on his own showing, without inquiring whether there was a demurrer or formal plea of the statute of limitations contained in the answer,"—nevertheless, to entitle them to recover thereon, they must show that by the exercise of reasonable diligence they would have failed to discover the fraud of which they aver they were ignorant.   In *Johnston* v. *Standard Mining Co.*, 148 U. S. 360 (13 Sup. Ct. 585), it is held that, where a question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence.   In *Bacon* v. *Chase*, 83 Iowa, 521 (50 N. W. 23), the facts were that a man, having died in Iowa, seised of certain lands in that state, left surviving him several minor children, who resided in Massachusetts.   These lands, without notice

34 OR.—39.

to them, were sold by order of the Probate Court of Woodbury County, Iowa, to pay the debts of the estate. Ten years after the youngest heir became of age suit was instituted to recover such lands from the purchasers under the administrator's sale, and, it appearing at the trial that the heirs had known for many years that their ancestor died seised of these lands, but they had made no inquiries as to their rights until a short time prior to the commencement of the suit, it was held that they were guilty of such laches as to preclude their right of recovery. To the same effect, see *Teall* v. *Slaven*, 40 Fed. 774; *Naddo* v. *Bardon*, 51 Fed. 493 (2 C. C. A. 335); *Hayward* v. *Elliott National Bank*, 96 U. S. 611; *New Albany* v. *Burke*, 78 U. S. (11 Wall.) 96; *Hardt* v. *Heidweyer*, 152 U. S. 547 (14 Sup. Ct. 671).

When the property forming the subject of the suit is speculative in character, thereby rendering it liable to great and rapid fluctuations in value, prompt action by the party claiming to have been defrauded by its transfer is necessary to repel the imputation of laches which a court of equity invokes from any unreasonable delay in applying to it for relief: *Hammond* v. *Hopkins*, 143 U. S. 224 (12 Sup. Ct. 418); *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Pratt* v. *California Mining Co.*, 24 Fed. 869, 9 Sawy. 354; *Hayward* v. *Elliott National Bank*, 96 U. S. 611. Rosenthal cut and removed the heavy timber which grew upon the land, rendering it arable. He set out orchards, erected costly buildings, and made other valuable improvements. He laid out a part of the tract into lots and blocks, many of which he has sold and conveyed; and he contributed the sum of $5,000 to secure the building of an electric railway from the City of Portland to the premises, of which he has had the exclusive possession until the land is worth, as plaintiffs allege, the sum of $100,000. The great

and rapid increase in the value of this land imposed upon plaintiffs the duty of acting promptly in seeking to recover it, unless they could not, by the exercise of reasonable diligence, have discovered the fraud of which they complain, for, as was said by Mr. Chief Justice Lord in *Sedlak* v. *Sedlak*, 14 Or. 540 (13 Pac. 452) : "The general rule, without doubt, is that no lapse of time or delay in bringing the suit will be a bar to the remedy in equity, providing the injured party during the interval was ignorant of the fraud. But the ignorance of such party must not have been negligent, for if, by reasonable diligence, the fraud could have been discovered, or ought to have been known, he will be deemed guilty of laches, or of acquiescence, and equity will refuse to interfere." The plaintiffs were, on January 23, 1871, personally cited to appear in the county court of said county, and show why an order should not be made to sell the real property of which their father died seised, and at that time Olive was fifteen, Lola twelve, and Katie ten years old, and each must have known that her father, at his death, was the owner of the property. The evidence tends to show that Olive, after her marriage, lived for several months just across the county road from this land, and that she frequently called at Rosenthals, and that her sisters, then living in Portland, visited her at this place, and also called upon Rosenthal's daughters. An examination of the records of deeds of said county would have disclosed that the administrator's and Goldsmith's deeds of said land were duly recorded April 18, 1871, and April 29, 1876, respectively, and knowing, as they must, that their father died seised of this land, their failure to examine such record renders their laches so gross as to preclude their recovery of the land, and hence the decree is affirmed.

Affirmed.